# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-KA-01311-COA

**VICTOR SIMS A/K/A VICTOR L. SIMS A/K/A VICTOR LAVINO SIMS**                                                 APPELLANT

**v.**

**STATE OF MISSISSIPPI**                                                 APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 06/24/2015 |
| TRIAL JUDGE: | HON. WAYMAN DAL WILLIAMSON |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | ANTHONY J. BUCKLEY |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF FOUR COUNTS OF ARMED ROBBERY AND SENTENCED TO FOUR CONCURRENT TERMS OF TWENTY-EIGHT YEARS, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | AFFIRMED - 09/20/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE ISHEE, P.J., CARLTON AND JAMES, JJ.**

**CARLTON, J., FOR THE COURT:**

¶1.     Victor Sims appeals his convictions and sentences for four separate counts of armed robbery. *See* Miss. Code Ann. § 97-3-79 (Rev. 2014).  On appeal, Sims raises the following issues:  (1) whether his trial attorneys rendered ineffective assistance of counsel; and (2) whether the verdicts were contrary to the weight of the evidence.  Finding no error, we

affirm.

**FACTS**

¶2.     On October 21, 2014, a Jones County grand jury indicted Sims and his nephew, Randy Dunn, for one count of armed robbery involving four separate victims. The single-count indictment charged that, on March 16, 2014, Sims and Dunn, working in conjunction with one another:

> [W]illfully, unlawfully, and feloniously attempt[ed] to take or took the personal property of Joyce McCoy, Evelyn Thomas, Dorothy Jackson, and Victoria Dean from the person and presence of [McCoy, Thomas, Jackson, and Dean], against their will, by violence to their person, by putting them in fear of immediate injury by exhibition of a handgun, a deadly weapon . . . .

¶3.     On December 11, 2014, the circuit court appointed Patrick Pacific as Sims's public defender. On February 3, 2015, Sims filed a pro se motion to dismiss the charge against him. The next month, on March 16, 2015, Pacific filed a motion in limine to exclude from the trial the alleged victims' statements and any references to the statements. In correspondence dated March 24, 2015, Sims wrote a letter to the Mississippi Bar in which he complained about his legal representation. Then, on March 27, 2015, Sims filed a second pro se motion to dismiss the charge against him. On April 1, 2015, Pacific filed a motion to withdraw as Sims's counsel. Citing Sims's letter to the Mississippi Bar, Pacific asserted to the circuit court that he felt he could no longer represent Sims.

¶4.     On April 2, 2015, the circuit court entered orders denying Sims's motion in limine and his two motions to dismiss the charge against him. Although the circuit court also denied

Pacific's motion to withdraw as Sims's attorney, the court appointed Brad Thompson from the public defender's office to serve as co-counsel on Sims's case. On April 17, 2015, Pacific and Thompson filed a motion to reduce Sims's bond. However, the circuit court denied that motion as well.

¶5.    The circuit court scheduled Sims's trial for May 18, 2015. However, ten days before trial, on May 8, 2015, the grand jury handed down an amended indictment against Sims and Dunn. The amended indictment still charged Sims and Dunn with armed robbery of the four victims named in the original indictment. However, instead of charging Sims and Dunn with only one count of armed robbery involving all four victims, the amended indictment now charged Sims and Dunn with four separate counts of armed robbery—one count for each of the four separate victims.

¶6.    On May 14, 2015, Sims's attorneys and Dunn's attorney filed an unsuccessful joint motion to quash the amended indictment. Although the circuit court denied the motion, the court rescheduled Sims's and Dunn's trial dates to afford each of the defendants a fair opportunity to present a defense to the amended multi-count indictment. Pursuant to its ruling, the circuit court rescheduled Sims's trial date for June 23, 2015.

¶7.    At Sims's trial, Lieutenant Robert Morris testified that he responded to an armed-robbery complaint at McCoy's house at 11:39 p.m. on March 16, 2014. When Lieutenant Morris arrived at the scene, McCoy informed him that she and several other ladies had been playing cards when two black males entered with guns and demanded the ladies' money.

3

Lieutenant Morris further testified that the ladies identified Sims as one of the robbers and stated that Sims and his accomplice drove away in a black Pontiac Grand Prix.

¶8.     Agent Josh Stringer with the Mississippi Bureau of Narcotics next testified. At the time of the armed robbery, Agent Stringer was employed as an officer with the Laurel Police Department. Agent Stringer also responded to the armed-robbery complaint at McCoy's house. While en route to McCoy's house, Agent Stringer learned Sims was a suspect and had allegedly fled the crime scene in a black Pontiac Grand Prix. Due to prior interactions with Sims, Agent Stringer knew Sims currently lived with his girlfriend, Sholanda Simmons, who owned a black Pontiac Grand Prix. As a result, Agent Stringer testified that he drove to Simmons's residence to try to locate Sims and the car.

¶9.     As he drove toward Simmons's house, Agent Stringer encountered a crowd of people gathered outside a nearby residence. Members of the crowd flagged down Agent Stringer's marked patrol car, and he pulled over to speak to them. Agent Stringer testified that one of the individuals, Octavia Jackson, said she had heard that Sims was a suspect in the armed robbery. Octavia further told Agent Stringer that she was not present at the time of the robbery but that she had been at McCoy's residence earlier in the evening when Sims had also been present. Agent Stringer testified that Octavia stated Sims had appeared to be under the influence of something and had caused a disturbance. Octavia told Agent Stringer that, due to Sims's behavior, McCoy had forced Sims to leave, and Octavia had left shortly after Sims.

4

¶10. Agent Stringer further testified that he spoke to Kimberly Ransom, who was present at the time of the armed robbery and had her wallet and some cash stolen. Agent Stringer said Ransom told him that she knew without a doubt that Sims and Dunn were the two suspects involved in the crime. Agent Stringer testified that Ransom informed him that Sims wore sunglasses and concealed the lower part of his face and that he held a small silver revolver. Ransom also told Agent Stringer that, even though Dunn wore what appeared to be a pair of stockings over his face, she still recognized him.

¶11. The jury next heard from McCoy, the victim who owned the house where the armed robbery occurred. McCoy stated that both Sims and his girlfriend, Simmons, had been at her home earlier in the evening prior to the robbery. McCoy testified that Sims wore a brown shirt and black pants during his initial visit and that he told Octavia, who was playing cards, that "[h]e should take her money out of her wallet."

¶12. McCoy further testified that, around 1 a.m., she was cleaning up the mess from the party in her bathroom when Sims returned. Even though Sims wore a black stocking cap over his face to hide his identity, McCoy stated that she could still see his complexion. McCoy also testified that Sims wore the same clothes from earlier and that she heard one of the other ladies refer to Sims by name when Sims entered the house. McCoy testified that Dunn accompanied Sims and pointed a silver gun at her while Sims pointed a black gun at the other ladies in the kitchen. McCoy said that, before leaving, Sims asked whether McCoy had anything on her. McCoy testified that she pointed to the couch, where her purse was

5

lying. According to McCoy, Sims stole her wallet, Social Security card, debit cards, and about $700 in cash from her purse.

¶13. The State next called McCoy's mother, Dorothy, as a witness. Dorothy also testified that Sims was at McCoy's house prior to the robbery and that he told Octavia he ought to take Octavia's money. Dorothy testified that one of the other ladies, Dean, then had some words with Sims following his comment to Octavia. Dorothy stated that Dean "told [Sims] to get out from behind her[,] talking about taking somebody's money, and he said a few words." Dorothy characterized the exchange between Dean and Sims as slightly hostile, and she testified that Sims left after the exchange. However, Dorothy further stated that Sims returned later with another man and that Sims wore the same brown shirt and black pants that he wore earlier. Dorothy testified that Sims pointed a silver pistol at her and the other ladies in the kitchen while his partner held a silver gun on her daughter, McCoy, in the bathroom. Although Sims wore something over his face, Dorothy testified that she recognized Sims and that Dean even called Sims by name after he entered. Dorothy further testified that Sims stole about $300 from her.

¶14. Thomas, another of the armed-robbery victims, testified that Sims and another man entered McCoy's house holding guns. Thomas stated that Sims held a silver revolver on her and the other ladies in the kitchen while his accomplice pointed a black gun at McCoy. Thomas testified that she recognized Sims because he wore the same clothes that he had on earlier in the day. According to Thomas, when Sims robbed her, he was wearing a brown

6

shirt, black pants, and a black baseball hat with a gold symbol on it. Thomas also testified that she had known Sims for about fifteen years and had worked with his mother. Thomas stated that Sims stole about $300 from her.

¶15. The final armed-robbery victim, Dean, testified next. Dean stated that, the first time Sims entered McCoy's home, he stood behind Dean's chair at the kitchen table. Dean further testified that Sims told Octavia that he needed to take Octavia's purse, and Dean said she was unsure whether Sims was joking when he made the statement. Regardless of whether Sims intended the comment as a joke, Dean told him to not stand behind her chair. Dean also stated that Sims, who was wearing a brown shirt and black pants, left McCoy's house soon after the exchange.

¶16. Dean further testified that, around 1 a.m., McCoy was tidying the house when someone entered the doorway directly behind Dean's chair and said, "Give up the money." Without turning around to look at the speaker, Dean testified that she replied, "Victor, get out from behind me playing." Dean said she immediately recognized the speaker as Sims because she had known Sims for over twenty years. When Dean finally turned around, she saw Sims and another man both holding guns. According to Dean, Sims's gun appeared to be black. Although Sims seemed to have a black stocking tied around his head, Dean testified that he was still wearing the same brown shirt and black pants from his earlier visit to McCoy's house. Dean stated that Sims and his accomplice stole about $250 from her.

¶17. During the defense's case-in-chief, Sims testified on his own behalf. Sims testified

7

that, on the night of the armed robbery, his girlfriend, Simmons, allowed him to borrow her car. Sims stated that he dropped Simmons off at McCoy's house around 6 p.m. and then returned a little after 9 p.m. to pick her up. While at McCoy's house to pick up Simmons, Sims testified that he jokingly made a comment to one of the ladies that he would "take [her] little chump change." Because Simmons had already left the card game by the time he arrived to pick her up, Sims testified that he did not stay at McCoy's house very long.

¶18. Sims and his sister, Verlinda, both testified that Sims left Verlinda's house around 10:30 p.m. the night of the robbery to go to Dunk's, a night club about thirty minutes away in Hebron, Mississippi. Sims testified that he stopped at a place called Norman's and then arrived at Dunk's around 11:30 p.m. Sims further stated that he was still at Dunk's when the armed robbery occurred. Sims's nephew, Phillip Sims, testified that he was also at Dunk's on the night in question and that he saw Sims there. According to Phillip's testimony, he first saw Sims around 12:25 a.m.

¶19. Upon learning that the police suspected Sims of the armed-robbery incident, Verlinda testified that she called Sims around 11:45 p.m. to relay the news. Despite Phillip's testimony that he saw Sims at Dunk's around 12:25 a.m., Verlinda testified that Sims met her around 12:30 a.m. at a local mall so he could return Simmons's car. Verlinda stated that she followed Sims to Simmons's house, where Sims parked Simmon's car and got into Verlinda's car. Verlinda testified that Sims had just climbed into her vehicle when the police arrived and arrested Sims.

¶20. After considering all the evidence and testimony, the jury found Sims guilty of all four armed-robbery counts. The circuit court then sentenced Sims to four concurrent terms of twenty-eight years in the custody of the Mississippi Department of Corrections. Sims filed an unsuccessful motion for a judgment notwithstanding the verdict or, in the alternative, a new trial. Aggrieved by his convictions and sentences, Sims appeals.

**DISCUSSION**

### I. Whether Sims's trial attorneys rendered ineffective assistance of counsel.

¶21. Sims argues that his trial attorneys rendered ineffective assistance of counsel by failing to object to the prejudicial hearsay testimony of two of the State's witnesses and by failing to request an alibi jury instruction. We separately address each of the two allegations raised under this assignment of error. Upon review, we find no merit to Sims's ineffective-assistance-of-counsel claim.

¶22. To prove ineffective assistance of counsel, Sims must show (1) his attorneys' performance was deficient, and (2) the deficiency prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Appellate courts presume that trial counsel's decisions are strategic, and we give great deference to trial counsel's performance. *Blunt v. State*, 55 So. 3d 207, 210 (¶11) (Miss. Ct. App. 2011). "With respect to the overall performance of the attorney, counsel's choice of whether or not to file certain motions, call witnesses, ask certain questions, or make certain objections falls within the ambit of trial strategy and cannot give rise to an ineffective[-]assistance[-]of[-]counsel claim." *Shinn v.*

9

*State*, 174 So. 3d 961, 965 (¶10) (Miss. Ct. App. 2015) (citation omitted).

¶23. Thus, defendants face "a strong but rebuttable presumption that counsel's performance falls within the broad spectrum of reasonable professional assistance." *Blunt*, 55 So. 3d at 210 (¶11) (citation omitted). To overcome the presumption, a defendant must show a reasonable probability that, but for his counsel's unprofessional errors, the outcome of the proceeding would have been different. *Goldman v. State*, 162 So. 3d 889, 893 (¶15) (Miss. Ct. App. 2015). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. In examining ineffective-assistance-of-counsel claims, the appellate court conducts a de novo review of the record as a whole and looks at the totality of the circumstances. *Blunt*, 55 So. 3d at 210 (¶12).

¶24. As we have previously stated:

> It is unusual for this Court to consider a claim of ineffective assistance of counsel when the claim is made on direct appeal because there is usually insufficient evidence within the record to evaluate the claim. Because an appellate court is limited to the trial record on direct appeal, issues of ineffective assistance of counsel are more appropriate in a motion for postconviction relief. We may address such claims on direct appeal only if (a) the issues are based on facts fully apparent from the record, or (b) the parties stipulate that the record is adequate, and we determine that additional findings of fact by a trial judge are not needed[.] If the record is not sufficient to address the claims on direct appeal, we dismiss the claims without prejudice, preserving the defendant's right to raise the claims later in a properly filed motion for postconviction relief.

*Shinn*, 174 So. 3d at 965 (¶11) (internal citations and quotation marks omitted).

10

¶25.  In addressing Sims's claim of ineffective assistance of counsel, we acknowledge that the State declines to stipulate that the record is adequate for judicial review of this issue on direct appeal.  Therefore, unless the issue is "based on facts fully apparent from the record[,]" we must dismiss Sims's claim without prejudice.  *Id.* (citation omitted).  Upon review, we find the record in this case contains sufficient evidence to address Sims's claim on direct appeal.  We therefore address the merits of Sims's ineffective-assistance-of-counsel claim.  We first discuss Sims's allegation that his attorneys rendered ineffective assistance by failing to object to certain hearsay testimony.  We then address Sims's assertion that his attorneys erred by failing to request an alibi jury instruction.

### a.  Hearsay Testimony

¶26.  Sims contends that his trial attorneys repeatedly failed to object to prejudicial and inadmissible hearsay testimony elicited from two of the State's witnesses. Specifically, Sims takes issue with the following:  (1) Lieutenant Morris's testimony about "what [the] women at the card game supposedly told him about the robbery[,]" including his testimony that Dean "allegedly told him she definitely recognized . . . Sims as the robber and called [Sims] by name"; and (2) Agent Stringer's testimony about the statements Octavia and Ransom gave him, including Octavia's statement that she had heard one of the suspected armed robbers was Sims, and Ransom's statement that she was present when the robbery occurred and knew the robbers were Sims and Dunn.

¶27.  "We presume that decisions not to object to testimony were strategic if they fairly can

be characterized as such." *Shinn*, 174 So. 3d at 967 (¶15) (citations omitted). In the present case, the State argues that Sims's attorneys raised no objections at trial to Lieutenant Morris's and Agent Stringer's testimony as part of a reasonable trial strategy to "fully develop the inconsistencies between what certain witnesses initially told police and what [those same witnesses later] testif[ied] to at trial." Upon review, we agree that the evidence in the record reflects and supports a trial strategy of attacking inconsistencies in witness testimony. Thus, we find that the decision by Sims's attorneys to not object to the disputed testimony can be fairly characterized as a strategic decision.

¶28. Throughout Sims's trial, the record reflects that the defense attempted to emphasize the inconsistencies existing among the various witness accounts of the armed robbery. During opening statements, Sims's attorney, Pacific, stated:

> Now, we don't really know what happened that night. There [were] so many inconsistencies in the statements [as to] what happened, who wore what, who said what, [and] who was there. . . . The only evidence that we have that ties . . . Sims to this crime is the four victims' statements[,] which all somewhat contradict each other . . . .

¶29. During the State's case-in-chief, Sims's attorneys repeatedly seized upon the opportunity to cross-examine witnesses about the various inconsistencies in their accounts of the armed robbery. With respect to Lieutenant Morris's testimony and Agent Stringer's testimony, Sims's attorneys questioned the two law-enforcement officials about the differing accounts of the armed robbery related to them by the alleged victims.

¶30. As the record reflects, Lieutenant Morris testified on direct examination that he

12

responded to the armed-robbery call at McCoy's house. While interviewing the witnesses present at the scene, Lieutenant Morris testified that Dean told him that she recognized Sims as one of the armed robbers because she had known Sims for a while, because Sims had been at McCoy's house earlier in the evening wearing almost the exact same clothing, and because Dean recognized Sims's voice.

¶31. Although Sims's attorneys raised no objection to Lieutenant Morris's direct testimony about what Dean told him, the record reflects that the defense revisited the issue during Lieutenant Morris's cross-examination. In response to questions by Sims's attorneys, Lieutenant Morris admitted that, other than Dean, none of the other ladies at McCoy's house told him that Sims was one of the armed robbers. Furthermore, Lieutenant Morris testified during his cross-examination that he found nothing inside or outside the house to implicate Sims in the crime. Instead, Lieutenant Morris agreed that he and his fellow officers began to consider Sims as a suspect based solely on the statements provided by the ladies at McCoy's house. We also note that Dean herself testified to the same statements that Lieutenant Morris attributed to her during his testimony. As the record reflects, Sims's attorneys then had an opportunity to question her about her statements during cross-examination.

¶32. Following Lieutenant Morris's testimony, the State next called Agent Stringer as a witness. Agent Stringer testified on direct examination that, as he was driving to the house of Sims's girlfriend to look for Sims and the suspected getaway car, he encountered Octavia.

13

Agent Stringer stated that Octavia wanted to report the armed robbery to him. Agent Stringer further stated that he informed Octavia that law enforcement already knew of the armed robbery, and he asked whether Octavia had any information on the crime. Octavia responded that she had been present at McCoy's house earlier in the evening but had not been present when the robbery actually occurred. Agent Stringer testified that Octavia also stated she had heard that Sims was a suspect in the robbery. In addition, Agent Stringer testified that he spoke to Ransom, who told him that she was present when the armed robbery occurred and that "she knew without a doubt" that Sims and Dunn were the two suspects involved in the armed robbery.

¶33. As the record reflects, Sims's attorneys again raised no objections to Agent Stringer's testimony as to what Octavia and Ransom told him. However, on cross-examination, Sims's attorneys further questioned Agent Stringer about the statements each woman gave him on the night of the armed robbery. With regard to Octavia's statement, the record shows that Agent Stringer again testified that Octavia had admitted she was not present at the time of the armed robbery and was simply relaying information she had heard from someone else. With regard to Ransom's statement, Sims's attorneys asked on cross-examination whether Agent Stringer was aware that Ransom had later signed a statement saying that Sims was not, in fact, involved in the armed robbery. In response, Agent Stringer testified that he was not aware that Ransom had signed such a statement since that would have been handled by the case investigators rather than by him.

14

¶34. In questioning the four victims about the events of the armed robbery, the defense continued to highlight any inconsistencies existing in their testimony. The record shows that, in addition to identifying discrepancies between the witnesses' trial testimony and their prior statements to police, the defense also attempted to emphasize the inconsistencies that existed from one account of the armed robbery to the next. Finally, during its closing argument, the defense once again identified for the jury the various discrepancies and inconsistencies existing among the witnesses' accounts of the armed robbery.

¶35. Upon review, we find that Sims fails to meet his burden to show that his attorneys' "representation fell below an objective standard of reasonableness." *See Strickland*, 466 U.S. at 688. As our caselaw recognizes, Sims was only guaranteed "the right to reasonably effective counsel or competent counsel, not perfect counsel or one who makes no mistakes at trial." *Havard v. State*, 928 So. 2d 771, 780 (¶7) (Miss. 2006) (citations omitted). Furthermore, as previously stated, "counsel's choice of whether or not to . . . make certain objections falls within the ambit of trial strategy and cannot give rise to an ineffective[-]assistance[-]of[-]counsel claim." *Shinn*, 174 So. 3d at 965 (¶10) (citation omitted). After reviewing the totality of the circumstances, we find the record contains evidence to show that Sims's attorneys may have decided not to object to the disputed testimony as part of an overall trial strategy to attack the inconsistencies existing in the testimony of the various eyewitnesses and the State's other witnesses. As a result, we find no merit to this assignment of error.

### b. Alibi Jury Instruction

¶36. As acknowledged, Sims also contends that his trial attorneys provided ineffective assistance of counsel because they failed to request an alibi jury instruction. According to Sims, his alleged alibi constituted his sole defense at trial. Sims asserts that his attorneys' failure to request an alibi jury instruction meant the jury was not properly presented with his theory of the case and was not informed that he did not have to prove the truth of his alibi.

¶37. Jurisprudence reflects that this Court has previously upheld ineffective-assistance-of-counsel claims due to inadequate jury instructions. *McTiller v. State*, 113 So. 3d 1284, 1291 (¶23) (Miss. Ct. App. 2013). "When claiming ineffective assistance of trial counsel because of jury instructions, it is the duty of the appellant to demonstrate both error in failing to receive the instruction and the prejudice to the defense." *Havard*, 928 So. 2d at 789 (¶28) (citation and internal quotation marks omitted). As this Court has stated:

> When confronted with issues concerning jury instructions, an appellate court's primary concern is that the jury was fairly instructed and that each party's proof-grounded theory of the case was placed before it. A defendant is entitled to jury instructions that support his theory of the case, even when the evidence supporting his theory is weak, inconsistent, or of doubtful credibility. Evidence supporting the defendant's theory of the case may even arise from . . . his own testimony.

*Love v. State*, 85 So. 3d 940, 942 (¶8) (Miss. Ct. App. 2012) (internal citations and quotation marks omitted).

¶38. Although Sims claims that his alibi constituted his sole defense at trial, as previously discussed, the record shows that his attorneys pursued a defense and a trial strategy that

16

attacked the contradictions and inconsistencies in the victims' stories to impeach the victims' credibility. In the defense's opening statement and closing argument, Sims's attorneys never referenced Sims's alleged alibi but instead repeatedly emphasized the discrepancies among the different eyewitness accounts of the armed robbery. In addition, throughout the trial, Sims's attorneys questioned the victims and other witnesses about the inconsistencies in the victims' stories.

¶39. The record also shows that Sims testified on his own behalf and asserted that he was at a night club at the time of the armed robbery. A review of the record, however, shows that the trial testimony, including Sims's own testimony, failed to support an alibi instruction or to foreclose the possibility that Sims possessed the opportunity to commit the offense.

¶40. As the record reflects, the victims identified Sims as one of the armed robbers, and Sims himself testified that he had known the victims "for a long time." Sims also admitted being at McCoy's house prior to the armed robbery to pick up his girlfriend, Simmons. Sims further testified, though, that he was about thirty minutes away at Dunk's, a night club, when the armed robbery occurred. Lieutenant Morris testified that he responded to the armed-robbery complaint at McCoy's house at 11:39 p.m. According to Sims, he arrived at Dunk's around 11:30 p.m. Sims's nephew, Phillip, similarly testified that Sims was at Dunk's the night of the armed robbery. However, Phillip testified that he did not see Sims at the night club until around 12:25 a.m. Thus, as the record reflects, no one testified to seeing Sims at Dunk's at the time the armed robbery actually occurred.

17

¶41. The record also reflects that Sims's sister, Verlinda, testified to meeting Sims at a local mall around 12:30 a.m. Verlinda further testified that she then followed Sims to his girlfriend's house to return the girlfriend's vehicle. According to Verlinda, Sims had just climbed into her vehicle when police arrived and arrested him. Thus, the testimony provided at trial placed Sims within the geographical location of the armed robbery around the time that the crime occurred. The testimony revealed that Sims possessed the opportunity to commit the armed robbery at the reported time of the offense. As a result, the testimony failed to provide Sims with an alibi that foreclosed the possibility that he committed the armed robbery at the reported time and location of the crime.

¶42. The record reflects that Sims's testimony constituted a general denial of having committed the crime. Instead of pursuing an alibi defense, Sims's attorneys attacked the credibility of the witnesses by highlighting the inconsistencies and contradictions in their stories. Rule 9.05 of the Uniform Rules of Circuit and County Court sets forth the discovery requirements for asserting an alibi defense. We acknowledge that, in its appellate brief, the State provides that "the prosecutor indicated a month prior to trial [that] the defense had provided a written notice of the intention to offer an alibi defense as required by [R]ule 9.05 . . . , [but] we cannot find such in the record." Indeed, the record before this Court contains no documents to show that Sims provided notice to the State of his intent to assert an alibi defense, including the specific place he claimed to be during the alleged offense and the names of any witnesses upon whom he intended to rely to establish his alleged alibi defense.

*See* URCCC 9.05.

¶43.   We now turn to jurisprudence to review the evidentiary predicate for an alibi defense and related jury instructions.  In *Owens v. State*, 809 So. 2d 744, 746-47 (¶¶7-8) (Miss. Ct. App. 2002), this Court stated:

> [T]he law relating to an alibi defense involves something more than a simple denial by the defendant that he was present at the precise time the crime was committed.  Black's Law Dictionary suggests that the defense requires evidence that the defendant's location at the relevant time was "so removed therefrom as to render it impossible for him to be the guilty party."  Black's Law Dictionary 71 (7th ed. 1999).  Thus, a defendant in close enough physical proximity to have committed the crime may deny the criminal activity and may affirmatively assert that he was elsewhere at the critical time.  However, if the asserted alternate location is such that, based on the version of events contended for by the defense, it would remain within the realm of physical possibility for the defendant to have committed the crime, then the defense is nothing more than a denial and would not rise to the level of alibi.  It is a fundamental concept of our system of criminal procedure that an instruction may not be given, even if it correctly recites the law, if there is no evidentiary basis for the instruction.  *Hodge v. State*, 801 So. 2d 762, 775 (¶42) (Miss. Ct. App. 2001).
>
> A defendant desiring to assert an alibi defense must, therefore, present evidence that, if found credible by the jury, would raise a reasonable doubt as to his culpability based on notions of the physical impossibility of having been at the crime scene during the crime's commission.

¶44.   As already discussed, Sims testified that he was at a night club at the time the armed robbery occurred, and Sims's nephew, Phillip, testified that he saw Sims at the night club around 12:25 a.m.  However, the record reflects that officers responded to the armed-robbery complaint at McCoy's house at 11:39 p.m.  In addition, Phillip's testimony directly contradicted the defense testimony given by Sims's sister, Verlinda, who stated that she met

19

Sims at a local mall at 12:30 a.m. so he could return his girlfriend's car.

¶45. Despite Sims's testimony denying that he committed the crime and claiming that he was at a night club at the time, as in *Owens*, Sims failed to offer "evidence as to the physical distance from his alleged location to the place where the crime was committed from which the jury could reasonably conclude that it was impossible for him to have committed the crime." *Owens*, 809 So. 2d at 747 (¶8). As a result, the record shows that Sims's evidence, or lack thereof, failed to present the necessary elements of an alibi defense. Thus, the circuit court was not required to instruct the jury on the issue. *See id.*; *see also Cochran v. State*, 913 So. 2d 371, 374-75 (¶¶10-15) (Miss. Ct. App. 2005) (finding that the trial court correctly denied the defendant's alibi jury instruction because the instruction lacked a foundation in the evidence).

¶46. Based on a review of the record and Mississippi caselaw, we find that Sims's testimony amounted to a simple denial of having committed the crime that failed to require an alibi jury instruction. *See Owens*, 809 So. 2d at 746-47 (¶¶7-8). Since the evidence failed to provide a sufficient evidentiary foundation to support or require an alibi instruction, we find no ineffective assistance of counsel by Sims's attorneys based on the failure to request such an instruction. In addition, we find that Sims's attorneys may very well have chosen not to submit an alibi jury instruction as part of a calculated trial strategy and due to a lack of a sufficient evidentiary foundation for such an instruction. Although this strategy proved unsuccessful, we cannot say that Sims's attorneys provided a deficient performance or that,

20

but for their deficient performance with regard to this issue, a reasonable probability exists that the outcome of the trial would have been different. *See also Havard*, 928 So. 2d at 791 (¶32) ("Trial counsel's decision not to submit lesser offense instructions, while it turned out to be unsuccessful, was appropriate trial strategy, and thus beyond the realm of serious consideration on a claim of ineffective assistance of counsel."). We therefore find no merit to Sims's argument that his attorneys were ineffective due to their failure to submit an alibi jury instruction.

## II.     Whether the verdicts were contrary to the weight of the evidence.

¶47.    Sims next contends that the jury's guilty verdicts were contrary to the weight of the evidence. According to Sims, the testimony of the four alleged armed-robbery victims was so contradictory that the testimony failed to support the verdicts against him. In addressing Sims's argument, we apply the following standard of review:

> When considering challenges to the weight of the evidence, we view the evidence in the light most favorable to the verdict. To disturb a verdict on this ground, we would have to find it was contrary to the overwhelming weight of the evidence and an unconscionable injustice. Our review requires [that] we accept all evidence consistent with the defendant's guilt as true[,] together with any reasonable inferences that may be drawn from the evidence. Any factual disputes are properly resolved by the jury and do not mandate a new trial.

*Duke v. State*, 146 So. 3d 401, 407 (¶22) (Miss. Ct. App. 2014) (internal citations and quotation marks omitted).

¶48.    A review of the record reflects no merit in Sims's contention that the verdicts were contrary to the weight of the evidence. Though the victims' testimony about the armed

21

robbery contained inconsistencies, these conflicts are not sufficient to warrant a reversal of the guilty verdicts. *See id.* at (¶23); *Grossley v. State*, 127 So. 3d 1143, 1149 (¶20) (Miss. Ct. App. 2013). While the victims' testimony varied in some respects, their accounts also corroborated each other on several material points. The victims' testimony also provided sufficient evidence of each element of the indicted offenses for the jury to find Sims guilty of each offense beyond a reasonable doubt. Furthermore, we recognize that the determination of how much weight and credibility to give to a witness's testimony falls within the jury's province. *Price v. State*, 23 So. 3d 582, 586 (¶17) (Miss. Ct. App. 2009).

¶49. As the record reflects, all four of the armed-robbery victims named in Sims's indictment identified Sims as one of the two men who entered McCoy's house on March 16, 2014, and robbed them at gunpoint. The women testified that they recognized Sims even though he tried to conceal his face. According to the four victims of the armed robbery, Sims had been at McCoy's house prior to the robbery, and he had worn a brown shirt and black pants. All four women testified that Sims still wore the same brown shirt and black pants when he returned to rob them. Thomas testified that she also recognized Sims because she had known him for about fifteen years and had worked with his mother. In addition, Dean stated that, even before turning around to look at the robbers, she recognized Sims's voice and that she addressed Sims by name. According to Dean, she immediately recognized Sims because she had known him for over twenty years.

¶50. The record also reflects that the victims reported to law enforcement that the robbers

22

drove away in a black Pontiac Grand Prix. According to Agent Stringer, he knew from his prior interactions with Sims that Sims's girlfriend owned a black Pontiac Grand Prix. Furthermore, as Sims himself testified at trial, his girlfriend had let him borrow her car on the night of the armed robbery. Sims's sister, Verlinda, also testified that she met Sims at a local mall around 12:30 a.m. so he could return Simmons's car.

¶51. After viewing the evidence in the light most favorable to the jury's verdicts, we cannot say that the inferences the jury drew from the evidence were unreasonable or that the verdicts against Sims are unconscionable. *See Duke*, 146 So. 3d at 407 (¶22). We therefore find no merit to Sims's assignment of error.

¶52. **THE JUDGMENT OF THE JONES COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT, OF CONVICTION OF FOUR COUNTS OF ARMED ROBBERY AND SENTENCE OF FOUR CONCURRENT TERMS OF TWENTY-EIGHT YEARS, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO JONES COUNTY.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, FAIR, JAMES, WILSON AND GREENLEE, JJ., CONCUR.**