# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00495-COA

**JUSTIN BODY**                                                        **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                          **APPELLEE**

DATE OF JUDGMENT:              04/14/2023
TRIAL JUDGE:                          HON. CALEB ELIAS MAY
COURT FROM WHICH APPEALED:    NEWTON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:       OFFICE OF STATE PUBLIC DEFENDER
                                      BY: HUNTER N. AIKENS
ATTORNEY FOR APPELLEE:        OFFICE OF THE ATTORNEY GENERAL
                                      BY: LAUREN GABRIELLE CANTRELL
DISTRICT ATTORNEY:            STEVEN SIMEON KILGORE
NATURE OF THE CASE:           CRIMINAL - FELONY
DISPOSITION:                  AFFIRMED - 10/08/2024
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., McDONALD AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     After messages between a 32-year-old man and a teenage girl were flagged as explicit, the man was arrested and charged with statutory rape. The teenage girl was subsequently identified and testified that she and Justin Body had intercourse on at least two occasions. After a jury trial was held, Body was ultimately found guilty. On appeal, he claims he was entitled to an alibi instruction. Finding no error, we affirm.

## BACKGROUND

¶2.     In June 2021, Facebook submitted a report to The National Center for Missing and

Exploited Children.[1]  The report was based on conversations the company observed between "an adult male" and "female child victim," indicating a possible risk of "child sexual molestation and online enticement."  The reported information was then sent to the Attorney General's Cyber Crimes Unit.  In turn, the Cyber Crime Unit contacted Investigator James Creel of the Newton Police Department regarding the "explicit messages" between fifteen-year-old Lara[2] and thirty-two-year-old Body.

¶3.     Investigator Creel interviewed Lara and subsequently arranged for her to attend a forensic interview.  During the interview, she disclosed that she and Body had engaged in sexual intercourse.  Soon after, Body was arrested and indicted for one count of statutory rape.

## PROCEDURAL HISTORY

¶4.     Body's indictment alleged he had committed a single count of statutory rape of Lara "in Newton County, Mississippi, on or between June 1, 2021 and July 21, 2021."

¶5.     Prior to trial, Body filed a "Notice of Alibi Defense," informing the State that "he intends to introduce testimony of witnesses that will testify that at or near the time the crime he is charged with committing occurred, he was in a location other than claimed[.]"  The notice listed Bianca Body, his ex-wife, and Jasmine Dove, with whom he had also had a

---

[1] NCMEC's mission is to help missing children, reduce child sexual exploitation, and prevent future victimization.  To further this goal, NCMEC works with Electronic Service Providers, such as Facebook, to reduce online child sexual abuse.

[2] To protect the minor's identity, we use a pseudonym.

relationship. The notice presented that one or both would be "expected to testify that during June 17, 2021 and June 23, 2021, Justin Body was in her presences [sic]."

*The State's Proof*

¶6. The State called two witnesses at trial: the investigator and the victim. Investigator Creel's testimony largely focused on the steps of his investigation. He recounted that at the time of his interview with the victim and her caregiver, Lara "was 15," and Body was in his thirties. Due to the nature of the crime alleged, Investigator Creel disclosed that Lara was sent for a forensic interview to ensure she spoke to someone "trained to talk with children" in a way they understood and were comfortable. He further disclosed that he was present for Lara's forensic interview, and what she told the interviewer "never changed" from what she told him during their initial interview.

¶7. Lara took the stand next. She testified that in June 2021 she was 15 years old. When asked how she knew Body, she responded that she had known him "basically my whole life" because her uncle and Body's sister dated. At some point, Body and Lara began to message each other on Facebook Messenger, and although it is unclear when the communications initially began, Lara testified that their day-to-day conversations resumed on June 15, 2021. During her testimony, the State sought to offer into evidence a printout of the hundreds of messages between an account marked "Justin Gtbody" and herself. When shown the series of messages, Lara testified she recognized them as her communications and did indeed send them. The large exhibit was entered into evidence without objection.

3

¶8. The messages spanned from June 15 through June 30, 2021, and much of the conversation revolved around the two making plans to see one another. In the messages, Body often told the teenager that she was "beautiful" and asked her to send photographs. There were also records of video chats between the two.

¶9. When asked if she ever went to Body's house on Pine Street, Lara testified that she visited his house "probably every other week" in June 2021. She further disclosed that she and Body had sexual intercourse at least twice—once in Body's bedroom and once in Body's car. The first encounter occurred in the early morning hours of Saturday, June 19, 2021. Lara read the messages from that morning aloud to the jury. Having made plans to meet up, Lara recounted that she asked Body, "Where we gonna go?" and he replied, "I don't know, love. I guess ride and find somewhere to park."

¶10. Lara confirmed that Body eventually picked her up that night, and they had sex. The exhibit further revealed that Lara messaged Body later that same day, "Bae last night keep replaying in my head," to which he responded, "Aaaww so th[a]t means [yo]u enjoy it."

¶11. Lara then disclosed the second time she and Body had sex again was Monday, June 21, 2021, shortly after midnight. Lara messaged Body, "Come get me," and he responded that he would but asked, "You gone ride me tonight?" Agreeing that she would, Body replied, "Awe sh*t, here I come." Lara testified that the two met up after the message exchange, and they again had sex.

¶12. Although Lara only highlighted two specific instances when she and Body had sex,

4

she further testified that their messages contained additional plans for the two to meet up—and that they did in fact meet up. She also told the jury how Body would sneak her inside his house when she would come over to make sure nobody saw them.

¶13. The jury heard that Lara believed that she and Body cared for each other:

> The State: Okay. Did you think that y'all were in a relationship together?
>
> Lara: I did.
>
> . . . .
>
> The State: But, at the end of the day, you were 15 years old having sex with a 32 year old; correct?
>
> Lara: Yes, ma'am.

¶14. After the State rested its case-in-chief, the Defense moved for a directed verdict, arguing the State "failed to meet its burden of proof to establish the elements of the crime of statutory rape." Finding the State presented enough evidence to establish a prima facie case, the trial court denied the motion.

*The Defense Witnesses*

¶15. The Defense presented three witnesses: Body's ex-girlfriend Jasmine, his ex-wife Bianca, and Body himself. Jasmine testified that she was in a romantic relationship with Body in 2021 and that in June of that same year, she lived with Body in his house on Pine Street. She further testified that both she and Body were employed at Tyson Foods in Forest in June 2021. Because they had the same schedule and "worked third shift" or "the graveyard shift," Jasmine explained to the jury that she and Body used her car to ride to work

5

together most days.

¶16.   Jasmine disclosed that she and Body worked Sunday night through Thursday night, with her shift beginning at 10 p.m. and ending at 6 a.m., and Body's shift beginning at 9 p.m. and ending at 6:30 a.m.  Both were off work on Friday and Saturday nights.  The Defense then questioned Jasmine about Body's whereabouts on Friday, June 18, 2021.

> Defense:   And then do you remember being with him any on Friday?
>
> Jasmine:   Yes, sir.
>
> Defense:   Were y'all ever apart, to your knowledge, on Friday?
>
> Jasmine:   No, sir.
>
> Defense:   What about Friday night?
>
> Jasmine:   No, sir.
>
> Defense:   What about Saturday – early Saturday morning, midnight, to 7 in the morning?
>
> Jasmine:   No, sir.  We were together until Saturday evening – late Saturday evening, and he left to go to Meridian.

¶17.   The Defense continued its questioning of Jasmine, who revealed that on the evening of Saturday, June 19, Body traveled to Meridian for Father's Day "to go see his kids by his ex-wife."  Acknowledging this caused conflict between the two, Jasmine testified that she "got verbal" and that she and Body "had words."  She also admitted that she had "busted his [car's] windshield" out on Sunday evening when he got back from Meridian, explaining this "was one of the nights that we didn't ride [to work] together."

6

¶18. During cross-examination, Jasmine testified that Body arrived back at his house from Meridian "late Sunday evening . . . sometime after 5." She confirmed that Body "didn't go to work" on Sunday, June 20, because she was his ride, and she chose not to drive him since the two had just gotten into an argument. Jasmine further disclosed that from the time she left for work Sunday evening around 8:15 p.m. until the next day (Monday, June 21) around 4 or 5 p.m., she and Body were apart.

¶19. The jury next heard from Body's ex-wife, Bianca. Though she and Body were still married during the time of the allegations, they had divorced by the time of trial. Bianca testified that Body lived with her "off and on" at her house in Meridian in June 2021. The Defense then questioned Bianca about Body's whereabouts during Father's Day weekend in June 2021.

> Defense: Do you know if Justin stayed with you any that weekend?
>
> Bianca: Yes, sir.
>
> Defense: What nights did he stay with you?
>
> Bianca: He stayed Friday and Saturday.
>
> Defense: Friday and Saturday? And Father's Day is on Sunday?
>
> Bianca: He left Sunday – he stayed Friday and Saturday . . . got a phone call, and he left. And he called me later on that morning and said his windows was busted; could I come and get him.
>
> Defense: Was that – the day he got a phone call his window was busted, was that on Father's Day?
>
> Bianca: Yes, Sunday.

Defense: So he stayed – you're saying he stayed Friday and Saturday and left on Sunday?

Bianca: Sunday morning.

¶20. After receiving the call from Body about his windshield Sunday morning, Bianca disclosed that she drove to Newton to pick him up and then drove him back to her house in Meridian. Fully under the impression that Body went to work the evening of Sunday, June 20, Bianca testified that he drove "my car to work" and left her house around "7:30, 8:00 [p.m.] maybe." According to Bianca, Body returned the following morning (Monday, June 21) with her car around 7:30, 8 a.m., and stayed with her "for like a week."

¶21. Last, Body himself took the stand. The defendant testified he had lived in Meridian with his then-wife, Bianca, but "was constantly being put out." So he "moved back to Newton" because he knew he "could stay at my grandma's house" if he "needed somewhere to go." He then developed a relationship with Jasmine while still being married.

¶22. Body confirmed Jasmine's earlier testimony that the two both worked at Tyson Foods and that he is off on Friday and Saturday nights. When asked how he spent his day and night on Friday, June 18, Body responded, "I want to say I spent it with Jasmine Dove because we stayed at the house Friday, and then that Saturday I had went to Meridian." Body explained he went to Meridian on Saturday, June 19, "to spend some time with my kids for Father's Day," but he did not let Jasmine know. He testified that when he returned to Newton Sunday morning and Jasmine found out, they had a "bad altercation" resulting in "a breakup and a busted window." Confirming Bianca's earlier testimony, Body testified he called Bianca to

8

come pick him up after the windshield incident, and she took him back to her house in Meridian.

¶23.    Defense counsel then questioned Body regarding his attendance at work that Sunday:

Defense:    Did you miss work Sunday night?  Because of the altercation, were you able to even make it to work on Sunday?

Body:    Yes, sir, through Bianca.

Defense:    I know but were you able to show up at work on Sunday night?

Body:    If I – Sunday night?

Defense:    The night your car got knocked out, were you even able to make it?

Body:    Yes, sir.  That's what I was trying to – that's what I was saying. I don't think I went to work that Sunday night because I stayed in Meridian.  I don't think I went that night.

When asked whether Lara ever came to his house in June 2021, Body responded:

Yes, sir.  Well, I don't know if she came because she – that's, like – my grandmother's house was, like, the chill spot for Newton, you know.  That was, like, a chill spot, so everybody –  it was a lot of people that kept coming through there and coming to the house.

Notably, Body testified that the people coming to his house were "somebody else's guests" and not his own.  Body was then asked if he remembered who spent the night at his house that Sunday night.  In response, Body recalled, "It was a lot of people there, and it was a lot of teenagers there."  He also denied ever seeing Lara at his house over the course of Father's Day weekend.

¶24.    The Defense then addressed the Facebook messages between Body and Lara.  Body

9

denied sending any of the messages, despite admitting that he used the account from which the messages came. He claimed that the phone the account was logged into "came up missing for two weeks" and only "popped back up two days before I got arrested off this charge." In fact, Body testified that in June 2021, he would leave the phone connected to his Facebook account at his house because it was only able to use Wi-Fi. Body was asked if he ever had sex with Lara and if he ever texted Lara about sex. He responded, "No, sir," to both questions.

¶25. After being prompted by his counsel regarding a "motive to lie," Body then testified that he believed Lara's "motive" for all of this was "wanting to get revenge" or because she was "upset about the fact that I had put her brother and her friend out of the house" because they were not contributing to the household and being disrespectful.

¶26. During his cross-examination, the State sought to offer into evidence Body's Tyson time sheets for the weeks of June 7, 2021, through June 27, 2021. When shown the document, Body testified he recognized it as a "record of my clock in, clock out" information and confirmed it appeared to be his time sheets for the above-reflected date range. The time sheets were entered into evidence without objection. The State then began questioning Body about when he worked based on the time sheets.

> The State: Okay. Now, we heard testimony from – sorry – I don't want to get their names mixed up – from Jasmine that you didn't go to work Sunday night?
>
> Body: Yes, ma'am.

The State:     But it's your testimony you did go to work Sunday night?

Body:          Yes, ma'am.

The State:     Okay. Now, I want to hand you [the time sheet], get you to look through it, and go to Sunday, June 20th, please. And when you get there, can you tell me what time you clocked in?

Body:          It ain't showing up.

The State:     It's not showing?

Body:          Hold on. Hold on. Hold on. It's saying, "Sunday no punch in found."

. . . .

The State:     Does it say you were absent for the full shift?

Body:          Yes, ma'am. Yes, ma'am.

. . . .

The State:     Okay. So absent full shift on Sunday, Father's Day night; is that correct?

Body:          Yes, ma'am.

The State:     Now, Jasmine said that y'all went to work together Monday night; right?

Body:          Yes, sir – yes ma'am.

The State:     Okay. But then Bianca said you used her vehicle to get to work?

Body:          Yes, ma'am.

The State:     Which one is it?

¶27.  After receiving a rather evasive answer from Body, the State switched gears and

11

focused its questioning on the Facebook messages. Body admitted that "Justin Gtbody" was his Facebook username, but he denied not only that the messages were from him but that he and Lara communicated at all. Adamant the messages were not from him, Body then claimed that he "let multiple people use my secondary phone" and that "[t]hey even knew the pass code to my phone." The State attempted to clarify Body's testimony.

The State: Okay. So [Lara] was messaging somebody else under your username?

Body: Yes, ma'am.

The State: And then when she testified that you're the person she had sex with, she was lying?

Body: She got to be, ma'am, because I don't remember it. I don't remember none of that.

The State: You don't remember it?

Body: I didn't do it.

¶28. After being asked when his birthday was, Body testified he was born in September 1988. Confirming that he would have been 32 years old in June 2021 and that Lara would have been 15 years old, the State asked once more if Body and the teenager had sex. Body responded, "I didn't have sex with her, ma'am."

*Jury Instruction Conference*

¶29. After the State called both a representative from Tyson and the victim in rebuttal, the trial court proceeded to hear arguments regarding what instructions the jury should be given. In accord with his pre-trial notice, Body requested two different alibi instructions, D-9 and

12

D-10. D-9 included the language, "[T]he alibi evidence that the defendant has placed before you seeks to convince you that the defendant was elsewhere at the time and therefore could not possibly have committed the acts charged" and that he "does not have to prove his claim that he was elsewhere." D-10 would have informed the jury that "[a]libi means not being at the scene of a crime" and that "[t]he defendant asserts that he was somewhere else when the crime was committed." Similar to D-9, D-10 represented that "the defendant does not have to prove that he was somewhere else at the time the crime was committed." Notably, D-10 is the model instruction for an alibi defense. Miss. Model Jury Instructions, Crim. § 2:1.

¶30.    The trial court heard from both sides on their positions and found that "there has not been a defense presented in this case that would make this of such that he would be so far removed from it or so removed from it to render it impossible." The trial court further noted that Body "just ha[d] not presented evidence to that level that would warrant issuing an alibi instruction in this case."

¶31.    Ultimately, the jury found Body guilty of statutory rape. He was sentenced to 25 years in the custody of the Mississippi Department of Corrections, with 5 of those years suspended and 20 years to serve, followed by 5 years of post-release supervision. He was also ordered to register as a sex offender upon release. The trial court denied his motion for a new trial and other relief. Body now appeals.

## STANDARD OF REVIEW

¶32.    "It is well-settled that jury instructions are within the discretion of the trial court, and

13

the standard of review for the denial of jury instructions is abuse of discretion." *Thompson v. State*, 119 So. 3d 1007, 1009 (¶3) (Miss. 2013) (citing *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010)). "It is fundamental in Mississippi jurisprudence that jury instructions must be supported by evidence." *Mootye v. State*, 287 So. 3d 270, 277 (¶17) (Miss. Ct. App. 2019) (quoting *Morris v. State*, 777 So. 2d 16, 29 (¶63) (Miss. 2000)).

## DISCUSSION

### It was not an abuse of discretion to refuse the alibi instructions.

¶33. On appeal, Body raises only one issue. He contends that the trial court erred in refusing to instruct the jury on his alibi defense and should have given one or both of the alibi instructions he submitted. Specifically, Body argues that because "there was a sufficient evidentiary basis to support the instruction and for a reasonable juror to conclude that a reasonable doubt existed as to [his] presence at the time and place of the crime," reversal is warranted.

¶34. "A defendant is entitled to a jury instruction supporting his alibi defense theory where the 'defendant asserts the defense of alibi[ ] and presents testimony in support of that defense . . . .'" *Id.* (quoting *Roper v. State*, 981 So. 2d 1021, 1023 (¶12) (Miss. Ct. App. 2008)). Crucially, where the proof offered at trial "does not support an alibi defense, the instruction should not be granted." *Roper*, 981 So. 2d at 1023 (¶12).

¶35. But "[a] defendant is not automatically entitled to an alibi instruction." *Hamlin v. State*, 306 So. 3d 843, 844 (¶4) (Miss. Ct. App. 2020). Instead, "an alibi defense involves

14

something more than a simple denial by the defendant that he was present at the precise time the crime was committed." *Id.* (citation omitted). "An alibi defense requires evidence that the defendant's location at the relevant time was so removed therefrom as to render it impossible for him to be the guilty party." *Id.* at (¶4).

¶36. In *Hamlin*, we examined whether a lawyer should have sought an alibi instruction for a client accused of statutory rape and sexual battery. *Id.* at (¶¶1-2). The defendant argued he was in Chicago for a portion of the time alleged in the indictment, meaning he was unable to commit the crime, so his lawyer should have requested the instruction. *Id.* at (¶¶7-8). Yet we reasoned that because the defendant "conceded he was in Sharkey County on three separate occasions" during the time period alleged in the indictment and further "admitted that he had access to his granddaughter" during that same period, "Hamlin was not so far geographically removed from the scene and time of the crimes as to render it impossible for him to be the guilty party." *Id.* at (¶9); *see also Ford v. State*, 230 So. 3d 316, 320-21 (¶¶13-14) (Miss. Ct. App. 2017) (finding "the evidence presented at trial did not require an alibi instruction" even though a defendant testified he was with his girlfriend at the time of a shooting since the girlfriend's "mobile home was located . . . in the vicinity of the shooting," and in any event "she was admittedly asleep at the time it occurred").

¶37. It is undisputed that both Bianca and Jasmine, the defendant's former wife and girlfriend, respectively, testified to being with Body on the night of June 19. Of course, both stories cannot be true. Perhaps Body would have been entitled to an alibi jury instruction if

15

June 19 was the only date for which he was indicted, and the only date on which Lara testified the two engaged in sexual intercourse. But that was not the only proof in this case.

¶38. Indeed, Lara also testified that she and Body had sex in the early morning hours of June 21, and the Facebook messages entered into evidence corroborated her testimony. Crucially, Body was indicted for only *one* count of statutory rape that allegedly occurred "on or between June 1, 2021 and July 21, 2021."[3] The majority of evidence narrowed down the indictment's time frame to Father's Day weekend in 2021, specifically spanning the evening of June 20 into the early morning of June 21.

¶39. Body's ex-girlfriend, Jasmine, testified that she went to work at Tyson on the evening of Sunday, June 20, without Body. Body's ex-wife, Bianca, testified that Body left her house in Meridian on Sunday evening to go to work. While both women attempted to provide an alibi for Body the night of June 19, the fact still remains that his whereabouts were left

---

[3] Mississippi law defines statutory rape as follows:

(1) The crime of statutory rape is committed when:

(a) Any person seventeen (17) years of age or older has sexual intercourse with a child who:

(i) Is at least fourteen (14) but under sixteen (16) years of age;

(ii) Is thirty-six (36) or more months younger than the person; and

(iii) Is not the person's spouse.

Miss. Code Ann. § 97-3-65(1)(a) (Supp. 2019).

16

completely unaccounted for on the evening of June 20 into the early morning of June 21. Furthermore, despite Body's inability to recall whether he actually attended work that Sunday, the time sheets from Tyson made clear that he did not. Since neither witness could account for Body's whereabouts the second night Lara testified she and Body had sex, under the unique facts of this case, the alibi instructions were without foundation in the evidence. Therefore, we find the trial court did not abuse its discretion in refusing to give instructions D-9 and D-10 as to the alibi defense.

¶40. Nonetheless, there is a second reason the instructions were properly rejected. Body's paramount defense was that he never had sex with Lara *at all*. On direct, his counsel asked him, "Did you ever have sex with [Lara]?" Body responded, "No, sir." And when asked "Did you ever text her about sex?" Body likewise testified, "No, sir." Indeed, Body even went so far as to deny the fact that the two communicated *at all*, despite hundreds of Facebook messages entered into evidence, which Lara testified were between her and Body. As our precedent makes clear, "an alibi defense involves something more than a simple denial by the defendant that he was present at the precise time the crime was committed." *Ford*, 230 So. 3d at 320 (¶10). Body's effort to seek an alibi defense was nothing more than an attempt to cloak his simple denial of the crime charged.

¶41. On appeal, Body further argues that we have departed from Supreme Court precedent as to when the alibi defense is available. He argues that a series of cases from this Court "have strayed from, and cannot be reconciled with, other law setting for the standards for the

17

alibi defense and, more generally, a defendant's right to instructions on his theory of defense."

¶42. Yet the cases which Body critiques span *twenty-two* years of this Court's jurisprudence, and over these decades, the Supreme Court has repeatedly denied certiorari review in cases of this type. *See, e.g., Golden v. State*, 323 So. 3d 1122, 1129 (¶16) (Miss. Ct. App. 2021) (affirming a denial of an alibi instruction when there "was also direct evidence contradicting Golden's statement or, at the very least, showing he was at two places that night"), *cert. denied*, 334 So. 3d 1162 (Miss. 2022); *Mootye*, 287 So. 3d at 281 (¶33) (affirming the denial of an alibi instruction when the defendant did not provide any evidence as to his physical location from the crime scene), *cert. denied*, 287 So. 3d 216 (Miss. 2020).

¶43. And our Supreme Court has recently reexamined the body of law pertaining to alibi instructions. Rejecting the "widespread belief" that corroboration is always required to obtain the alibi instruction, the Court ruled that "[w]hen a defendant takes the witness stand in his or her case-in-chief at trial, subject to cross-examination, and testifies he or she was not present and was somewhere else when the crime was committed, our law says that is enough to obtain an instruction." *Archie v. State*, 387 So. 3d 963, 974 (¶¶20, 22) (Miss. 2024). In issuing this holding, the Court overruled a series of cases from this Court that held to the contrary, abrogating *Golden*, 323 So. 3d at 1129 (¶16); *Sims v. State*, 213 So. 3d 90, 101 (¶41) (Miss. Ct. App. 2016); and *Owens v. State*, 809 So. 2d 744, 746-47 (¶8) (Miss. Ct. App. 2002). Notably, while the *Archie* decision deeply considered the availability of an alibi

18

defense, it did not in any way address the alleged restrictions or improper burden shifting of which Body complains. And Body has not raised that *Archie* in any way impacts our decision in his case.

¶44. All told, we find it was not an abuse of discretion for the trial court to refuse instructions D-9 and D-10 as they relate to Body's alibi defense.

## CONCLUSION

¶45. For the reasons set out above, Body's conviction and sentence are affirmed.

¶46. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**