# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-01016-COA

**GREGORY EUGENE MOOTYE, III A/K/A**            **APPELLANT**
**GREGORY MOOTYE**

**v.**

**STATE OF MISSISSIPPI**            **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 01/28/2011 |
| TRIAL JUDGE: | HON. ROBERT B. HELFRICH |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALICIA MARIE AINSWORTH |
| DISTRICT ATTORNEY: | PATRICIA A. THOMAS BURCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/04/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

      **EN BANC.**

      **CARLTON, P.J., FOR THE COURT:**

¶1. After a jury trial in Forrest County Circuit Court, Gregory Mootye was convicted of three counts of deliberate-design murder. For each count, he was sentenced to serve life in the custody of the Mississippi Department of Corrections (MDOC), with the sentences to run consecutively.

¶2. Mootye now appeals and asserts the following assignments of error: (1) the trial court erred in denying his alibi instruction; (2) the trial court erred in overruling his *Batson*[1]

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

objection; and (3) his trial counsel was ineffective. Finding no error, we affirm Mootye's convictions and sentences.

**FACTS**

¶3.     At approximately 4:40 a.m. on Monday, February 22, 2010, Officers Robert Sybert and Jason Pitts of the Hattiesburg Police Department were dispatched to 817 Dabbs Street in response to a 911 hangup call. Even though the door was locked, it was ajar. The officers entered the home, identifying themselves as law enforcement. Although the house was dark, Officer Sybert detected movement in a doorway and saw what appeared to be a white reflective band on the back of a person's jacket. As he moved toward the individual, Officer Sybert tripped over the body of a female covered in blood on the floor. The suspect, a tall black male wearing a dark-colored hooded jacket with what appeared to be a white shirt underneath, responded to the officers' commands and moved forward slowly. However, when Officer Pitts tried to arrest the suspect, he snatched his arm away, ran past the officers, and jumped off the porch. The officers chased the suspect but were unable to apprehend him.

¶4.     The deceased victim on the floor was identified as Angelica Twillie. A second deceased female—Angelica's mother, Alesia Twillie—was discovered in a bedroom.[2] Autopsies of the women revealed they had both been shot and stabbed multiple times. Furthermore, Angelica was several months pregnant, and it was determined that the unborn child's cause of death was ureteral placenta insufficiency due to the homicidal death of the mother.

_____

[2] Police also found Angelica's son, who was between fourteen and seventeen months old, alive at the residence.

2

¶5.    Mootye was rumored to be the father of Angelica's unborn child, and he was questioned by police. Mootye told Detective Branden McLemore that he had been at his apartment Sunday night until he left for work Monday morning, and his roommate, Deveiun Tripp, confirmed his alibi; so Mootye was released. Soon thereafter, Officer Pitts was shown a picture of Mootye and others on a digital camera, and he indicated that he was eighty percent sure that Mootye was the person he saw at the Twillies' house that night. Furthermore, two individuals—Chekeita Pittman and Taborious Lindsey—came forward with witness statements placing Mootye near the scene of the murders that morning. Before trial, when questioned further by police and charged with accessory after the fact, Tripp recanted his prior statement that supported Mootye's alibi and said Mootye confessed to him that he committed the murders. As we will discuss later in this opinion, Tripp also testified as to such at trial, stating that he picked Mootye up at an apartment complex the morning after the murders and that Mootye later asked him to move a gun.

¶6.    Mootye was indicted on three counts of deliberate-design murder for the deaths of Angelica, Alesia, and Angelica's unborn child. A jury trial was held on January 24–26, 2011. The two officers dispatched to the 911 call testified to the facts as stated above. Denise Rupple, a senior crime-scene analyst with the Bureau of Forensic Services, stated that a fillet knife, like the ones used at Marshall Durbin where Mootye and Angelica worked, was recovered near the house, and several .22-caliber shell casings were found in the home. No gun was recovered. Rupple also testified that the arcing pattern of blood splatters on the wall indicated the person used his or her left hand. (Mootye was left-handed.) She noted a

3

"gloved impression or fabric impression that was left in blood" and said the pattern was consistent with fabric gloves obtained from Marshall Durbin, but Rupple admitted that no glove was found at the crime scene. There were also bloody shoe prints at the scene.

¶7. During a search of Mootye's apartment, police retrieved an empty .22-caliber shell cartridge box from Tripp's bedroom. Two pairs of Nike high-top sneakers were also taken from the apartment for testing. Rupple testified that one pair's size and class "was consistent with the stains that were left – those shoe impressions that were left at the scene."

¶8. Pittman testified that she spent the evening with Mootye that Sunday night. Pittman stated that Mootye and Tripp watched a basketball game on television. She and Mootye went to bed somewhat early, but at approximately 4 a.m., he asked her "to take him to get some money from some dude" before he had to go to work that morning. Pittman was unfamiliar with the area, so Mootye directed her where to go. Pittman testified that Mootye realized he forgot his cell phone and he told her to come back for him later. Pittman turned the car around to leave and noticed Mootye standing on the porch of a home, later identified by her as the Twillies' house. She drove away and soon thereafter saw the police cars drive by. Worried, Pittman went to the apartment to get Tripp, saying they needed to check on Mootye. After looking for Mootye, they decided to go back to the apartment and wait. According to Pittman, Tripp woke her up about 7 a.m. saying Mootye had called and requested that she pick him up at her cousin's house. Pittman observed that Mootye was wearing a white "dingy-like shirt," and he told her "he had been running from the police." She noted "a little speck of blood, like, on his forehead." Pittman claimed that she met Mootye at his uncle's

4

house the following day and that he pulled a gun out of the trunk of her car.[3] Pittman acknowledged she only told police what happened after she was arrested for accessory after the fact.

¶9. Lindsey testified that he was staying at a friend's apartment and leaving for work at approximately 6:45 a.m. on February 22 when he heard someone call his name. He turned to see Mootye, whom he recognized from playing basketball at the YMCA. Mootye asked to use his phone. Lindsey testified that Mootye was wearing a white t-shirt, jeans, and black Nike tennis shoes, and he was holding a dark shirt in his hand. When Lindsey discovered Mootye had been arrested for the murders, he informed the police that Mootye had used his phone that morning. Lindsey's phone records reveal that the phone number called that morning was Tripp's number.

¶10. Tripp testified that he moved in with Mootye in November 2009 but had known him for many years. According to Tripp, Mootye was concerned that he had gotten a coworker pregnant.[4] The night Pittman came over, he and Mootye watched television and played video games. Mootye went to bed early because he had to work, but Tripp stayed up watching television with his nephew, Mario Smith. The two men went to get some fast food around 2 a.m. then came back to watch television until almost 4 a.m. When Tripp went to bed, he heard some movement coming from Mootye's room. Tripp testified that shortly after 5 a.m.,

---

[3] Testimony was that this was a .45-caliber pistol; not the gun presumably used in the murders. Pittman admitted that she only mentioned the gun in the trunk a couple of weeks before trial; she did not mention it in her original statement to police.

[4] DNA testing later revealed that Mootye was not the father of Angelica's unborn child.

5

Pittman knocked on his door and "panicked" because she could not find Mootye. Tripp and Pittman left in her car, but they quickly returned to the apartment because Tripp "had a bad feeling."[5] An hour or so later, Tripp got a call from an unknown number; it was Mootye asking for Pittman to come get him. Pittman asked Tripp to go with her. They picked up Mootye at an apartment complex where Pittman's cousin lived and returned to Mootye and Tripp's apartment.[6] Tripp stated that he heard Pittman say something about blood on Mootye's forehead, but Tripp testified that he never saw any blood. At the apartment, Mootye took a shower and got ready for work. Before leaving, he asked Tripp to take out the trash. Mootye called Tripp an hour later, informing him of Angelica's death, and asking Tripp to take a gun from Mootye's nightstand (a .45-caliber handgun) and put it in the trunk of Pittman's car. Tripp testified that Mootye also owned a .22-caliber gun, which he had let Tripp borrow, but Tripp claimed that he gave the gun back "a month before all this happened." Tripp testified that Mootye confessed to him later that afternoon that he killed the victims. Tripp admitted that when police initially questioned him, he told the police that Mootye had been home all evening. Tripp stated that he changed his statement to the police when he was arrested for accessory after the fact.

¶11. Detective McLemore testified that he had been called to the Twillies' residence in the

---

[5] Tripp confessed that the reason he did not want to take his car was because his "car ha[d] drawn attention before" from police.

[6] During opening statements, the State informed the jury that the apartment complex where Pittman and Tripp picked up Mootye was located "about a mile-and-a-half from the Twillie residence," where the murders occurred. Detective McLemore also testified at trial that the apartment complex where Pittman and Tripp picked up Mootye was "less than a mile-and-a-half" walk from the Twillies' residence.

6

past for domestic issues between Angelica and Curtis Price, the father of her other child; so after the discovery of Angelica and Alesia's bodies, police issued a "be on the lookout" (BOLO) for Price. Upon learning Mootye was the suspected father of Angelica's unborn child, the police also issued a BOLO for Mootye.

¶12. Detective McLemore stated that Price gave him an alibi, which was later confirmed. Upon Detective McLemore's request, Mootye came to the police station that afternoon. Both Price and Mootye submitted to a gunshot-residue test and a DNA test. Mootye also provided an alibi—that he was home the entire evening—and Detective McLemore confirmed Mootye's alibi with Tripp. As a result, Mootye was released. However, Detective McLemore said that the one thing that "stuck out" to him during the investigation was Rupple's indication that the person using the knife was left-handed, and Mootye was the only left-handed suspect. During his second interview with police, Mootye again asserted that he had been at his apartment Sunday evening until he went to work Monday.

¶13. With regard to DNA testing of the sneakers confiscated from Mootye's apartment, a forensic DNA analyst with Scales Biolab, Katherine Moyse, concluded that neither Mootye nor Tripp could be excluded as contributors. Tripp acknowledged that he had borrowed Mootye's shoes on prior occasions. Moyse testified that Mootye's DNA also could not be excluded as a contributor to the Y chromosome mixture on the handle of the knife that was recovered.

¶14. Mootye was convicted on all three counts of murder and sentenced to consecutive life sentences in the custody of the MDOC on each count. On February 7, 2011, Mootye filed

7

a motion for a judgment notwithstanding the verdict, or alternatively, for a new trial, which the trial court denied. Four years later, on May 18, 2015, Mootye filed a petition for an out-of-time appeal and an affidavit, asserting that his trial counsel had failed to file an appeal after his convictions or to advise Mootye of his right to appeal. The trial court granted Mootye's petition on July 13, 2016.[7]

¶15. Mootye is represented on appeal by the Office of Indigent Appeals, which argues that the circuit court's refusal to grant Mootye's alibi instruction and failure to perform a complete *Batson*[8] analysis constitutes reversible error. Mootye filed a supplemental pro se brief, reasserting as error the trial court's refusal to grant his alibi instruction and additionally claiming that his trial counsel was ineffective for failing to object to a lack of instruction on venue and failing to request a *Daubert*[9] hearing.

## DISCUSSION

### I.     Alibi Instruction

¶16.    Mootye argues that the trial court committed reversible error by refusing his proposed alibi instruction. Mootye maintains that Detective McLemore established the evidentiary basis for his alibi defense that he was at home on the night of the murders.

¶17.    "We review a trial court's rulings on jury instructions for an abuse of discretion."

---

[7] The circuit clerk erroneously forwarded Mootye's petition to the Mississippi Supreme Court, treating it as a motion for post-conviction relief. By order of the supreme court on September 1, 2015, the petition was remanded to the circuit court for a ruling.

[8] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[9] *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993).

*Wilson v. State*, 198 So. 3d 408, 410 (¶5) (Miss. Ct. App. 2016). "It is fundamental in Mississippi jurisprudence that jury instructions must be supported by evidence." *Morris v. State*, 777 So. 2d 16, 29 (¶63) (Miss. 2000). A defendant is entitled to a jury instruction supporting his alibi defense theory where the "defendant asserts the defense of alibi[] and presents testimony in support of that defense . . . " *Roper v. State*, 981 So. 2d 1021, 1023 (¶12) (Miss. Ct. App. 2008); *see also Morris v. State*, 777 So. 2d 16, 29 (¶63) (Miss. 2000). Conversely, if the evidence presented at trial "does not support an alibi defense, the instruction should not be granted." *Roper*, 981 So. 2d at 1023 (¶12).

¶18.    At trial, Mootye offered Jury Instruction D-5 as an alibi instruction. Jury Instruction D-5 stated:

> "Alibi" means elsewhere or in another place. In this case, the Defendant is asserting the defense of alibi by saying that he was at his apartment at the time of the crime.
>
> "Alibi" is a legal and proper defense in law. The defendant is not required to establish the truth of the alibi to your satisfaction, but if the evidence or lack of evidence in this case raises in the minds of the jury a reasonable doubt as to whether the Defendant was present and committed the crime, then you must give the Defendant the benefit of any reasonable doubt and find the Defendant not guilty.

The State objected to the instruction, asserting that it had not "received any notice of an alibi defense, and there certainly has not been any witnesses to indicate an alibi defense."

¶19.    At the time of Mootye's trial, Uniform Circuit and County Court Practice Rule 9.05[10] required:

_____

[10] Rule 9.05 has been replaced by Mississippi Rule of Criminal Procedure 17.4(a)(1), which is substantively identical for the purposes of this claim.

9

Upon the written demand of the prosecuting attorney . . . the defendant shall serve within ten days . . . upon the prosecuting attorney a written notice of the intention to offer a defense of alibi, which notice shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon which the defendant intends to rely to establish such alibi.

As Mootye observes, "[t]he rule clearly states that the requirement to disclose an alibi witness is triggered by the prosecution." *Hall v. State*, 925 So. 2d 856, 857 (¶4) (Miss. Ct. App. 2005). "Only after the prosecuting attorney makes a written demand is the defendant then required to provide a written notice of his intent to offer a defense of alibi." *Id.* (quoting *Ford v. State*, 862 So. 2d 554 (¶11) (Miss. Ct. App. 2003)). Moreover, "[t]he specific purpose of alibi defense discovery is to allow the state an opportunity of investigation and discovery of evidence, if any, which may rebut the anticipated alibi defense." *Robinson v. State*, 247 So. 3d 1212, 1227 (¶30) (Miss. 2018) (quoting *Coleman v. State*, 749 So. 2d 1003, 1009 (¶14) (Miss. 1999)). In this instance, the State made no such demand, and it concedes that Mootye was not required to provide notice under the Rule.

¶20. The trial court ultimately refused the jury instruction. The record reflects that the trial court did not base his refusal of the alibi instruction on the issue of notice; instead, he found that the evidence was insufficient to support the giving of the instruction. The trial court explained: "I'm not addressing whether you gave the notice, but I do think it takes something affirmative to show. You can't base it on a detective's testimony to say, well that's his alibi and have an alibi instruction submitted."

¶21. Mootye argues that the testimony from Detective McLemore established Mootye's alibi that he was at home on the night of the murders. The record reflects that Detective

10

McLemore testified during both of his interviews, Mootye informed him that he was at home all night on the night of the murders and that he did not leave. Detective McLemore testified Mootye stated he went to sleep between 11:00 p.m. and 11:30 p.m. that evening and left for work at 7:30 a.m. the next morning. Mootye argues that this testimony by Detective McLemore established the evidentiary basis for his alibi defense.

¶22. The State maintains that Detective McLemore's testimony did not support Mootye's alibi that he was home at the time of the murders; instead, Detective McLemore's testimony merely established that Mootye *told* him he was at home at the time. As a result, the State argues that Mootye only presented evidence that he *told* someone he was at home; he failed to present any evidence to show that he was actually at home or that his statement to Detective McLemore was truthful. The State contends that because Detective McLemore's testimony is not sufficient to establish Mootye's alibi that he was home when the murders occurred, Mootye's "defense is nothing more than a simple denial of guilt." *See Owens v. State*, 809 So. 2d 744, 746 (¶7) (Miss. Ct. App. 2002) (An alibi defense involves "more than a simple denial by the defendant that he was present at the precise time the crime was committed.").

¶23. At trial, Detective McLemore testified that he conducted a phone call with Tripp and verified Mootye's alibi. Detective McLemore stated that after he verified Mootye's alibi, he released Mootye. Detective McLemore explained as follows:

> A. I verified his – what [Mootye's] alibi was. . . . He told me that the night before that him, himself, Deveiun Tripp, and Mario, which is [Tripp's] nephew, were at the apartment at 200 Foxgate. They w[ere] there all night. They had watched the basketball game, I believe. The Lakers

11

> – he stated to me – and he couldn't remember the other team, but he said he watched it till around 7 or 8, and he remembers going to bed about 11 or 11:30. At that time[,] he said the next morning he woke up and went straight to work.
>
> Q. Did he indicate if he had ever left his house during the night of February 21 from 11 p.m. until he went to work?
>
> A. No, ma'am.
>
> . . . .
>
> Q. What, if anything, else did you learn from Mr. Mootye during that interview?
>
> A. Basically who could verify his alibi. He advised me that Deveiun Tripp could verify that he was there all night, that he did not leave the house, and he woke up the next morning.
>
> . . . .
>
> Q. Were you able to verify the alibi that you were given by Mr. Mootye?
>
> A. Yes, ma'am. It was – I did verify that alibi.

Again, the transcript reflects that Detective McLemore only released Mootye after verifying his alibi. Tripp's pretrial inconsistent statement that he recanted at trial was not substantive evidence at trial to support Mootye's alibi, but instead explained why Detective McLemore released Mootye after his initial arrest. *See DeHenre v. State*, 43 So. 3d 407, 419 (¶57) (Miss. 2010) ("Prior inconsistent, out-of-court statements made by a nonparty witness are not admissible as substantive evidence.").

¶24. However, Detective McLemore testified that later on in the investigation, Tripp gave another detective consent to search the apartment and Tripp's vehicle. Detective McLemore then conducted an interview with Tripp in person at the police department. Detective

McLemore stated: "Once I began interviewing [Tripp], [Tripp] came up with the information that stated to me that basically that [Mootye] was, in fact, not at home that night because he had went with [Pittman] to go and pick up [Mootye] at the apartment complex." Tripp advised Detective Mootye that Pittman could verify this story. According to Detective McLemore, Tripp also stated that Mootye told Tripp "he had hid the weapon that was used in the commission of the crime of the . . . homicide . . . in the air condition vent at th[at] apartment complex."

¶25. The record reflects that Tripp, the witness relied upon by Detective McLemore to verify Mootye's alibi, testified regarding his statements to police as follows:

Q. Someone from the police department called you?

A. Yes, ma'am.

. . . .

Q. Okay. What did they ask you?

A. They just asked me, you know, just basic questions like what [Mootye] was doing that Sunday night. Excuse me. And just asked me did I see him leave the house or anything like that.

Q. And what did you tell them?

A. I told them that, you know, he was home, and that I didn't see him leave the house at no point.

Q. And was that the truth?

A. Yes, ma'am.

Q. Was that the truth[,] though[,] that you told the police that you didn't see him leave the house?

13

A.     Oh, yeah, I didn't see him.  I didn't see him leave the house.

¶26.   Although Tripp testified that he did not personally witness Mootye leaving the apartment the night before or the morning of the murders, Tripp did testify at trial that he and Pittman picked up Mootye from an apartment complex later that morning.  Significantly, Tripp also testified that Mootye eventually confessed to him that he committed the murders, telling Tripp:  "[I]t was me.  I did it."  According to Tripp, Mootye said that after killing Angelica and Alesia, he was able to escape from the police.  He then ran to the apartment complex where Tripp and Pittman later picked him up.  On cross-examination, Tripp admitted: "I should have said [the truth] from the beginning but I didn't say it. . . . I mean, I lied, you know what I'm saying, the first time that I was questioned."  Tripp again stated, "I lied at first, but I'm telling the truth now."

¶27.   In *Sims v. State*, 213 So. 3d 90, 101 (¶43) (Miss. Ct. App. 2016) (quoting *Owens*, 809 So. 2d at 746-47 (¶¶7-8)), this Court held that "[t]he law relating to an alibi defense involves something more than a simple denial by the defendant that he was present at the precise time the crime was committed[;]" rather, "the defense requires evidence that the defendant's location at the relevant time was 'so removed therefrom as to render it impossible for him to be the guilty party.'" [(quoting Black's Law Dictionary 71 (7th ed. 1999))].[11]  The *Sims* Court explained that "a defendant in close enough physical proximity to have committed the crime may deny the criminal activity and may affirmatively assert that he was elsewhere at the critical time."  However, this Court clarified:

---

[11] *Owens*, 809 So. 2d at 746 (¶7), quotes from Black's Law Dictionary for this proposition.

> [I]f the asserted alternate location is such that, based on the version of events contended for by the defense, it would remain within the realm of physical possibility for the defendant to have committed the crime, then the defense is nothing more than a denial and would not rise to the level of alibi.

*Id.* This Court further stated that "[i]t is a fundamental concept of our system of criminal procedure that an instruction may not be given, even if it correctly recites the law, if there is no evidentiary basis for the instruction." *Id.*[12] Therefore, "[a] defendant desiring to assert an alibi defense must . . . present evidence that, if found credible by the jury, would raise a reasonable doubt as to his [guilt] based on notions of the physical impossibility of having been at the crime scene during the crime's commission." *Id.*

¶28. In *Sims*, the defendant, Sims, denied that he committed the charged crime of armed robbery and he testified that he was at a night club at the time the crime occurred. *Id.* at (¶44). Sims's nephew testified that he saw Sims at the night club nearly forty-five minutes after police officers responded to a call about the armed robbery. *Id.* Sims's sister, however, testified that she met Sims at a local mall at approximately the same time Sims's nephew placed Sims at the night club. *Id.*

¶29. Despite this testimony, this Court found that "Sims failed to offer 'evidence as to the physical distance from his alleged location to the place where the crime was committed from which the jury could reasonably conclude that it was impossible for him to have committed

---

[12] The *Owens* Court cited *Hodge v. State*, 801 So. 2d 762, 775 (¶42) (Miss. Ct. App. 2001), for this proposition. *Owens*, 809 So. 2d at 747 (¶7). In *Hodge*, this Court held that "a jury instruction must be supported by the evidence and be a correct statement of the law. A trial judge is vested with the discretion to refuse the jury instruction which misstates the law, lacks an evidentiary basis, or that is stated elsewhere in the instructions." *Hodge*, 801 So. 2d at 775 (¶42).

the crime.'" *Id*. at (¶45) (quoting *Owens*, 809 So. 2d at 747 (¶8)). Rather, "Sims's testimony amounted to a simple denial of having committed the crime that failed to require an alibi jury instruction." *Id*. at (¶46). This Court therefore held that because Sims failed to present sufficient evidence to set forth the necessary elements of an alibi defense, "the circuit court was not required to instruct the jury on the issue." *Id*. at (¶45).

¶30. In *Morris*, 777 So. 2d at 29 (¶65), the supreme court affirmed the trial court's denial of the defendant's alibi instruction. In so doing, the supreme court explained that "the only witness who could possibly have provided an alibi defense" for the defendant "testified that she never saw [him] at her home on the night of the shooting." *Id*. The supreme court therefore found that "[n]o testimony was presented that would establish an alibi defense" for the defendant. *Id*.

¶31. Additionally, in *Moore v. State*, 822 So. 2d 1100, 1110 (¶35) (Miss. Ct. App. 2002), the defendant, Moore, appealed the trial court's refusal to grant Moore's alibi instruction. Moore argued that testimony from a police officer supported the trial court granting his alibi instruction. *Id*. at (¶36). After reviewing the testimony, this Court found no error in the trial court's failure to grant Moore's alibi instruction because "[n]o evidence presented supported such an instruction." *Id*. at (¶37).

¶32. In the present case, Mootye argues that Detective McLemore established Mootye's alibi that Mootye was at home at the time of the murders. At trial, Detective McLemore testified that he verified Mootye's alibi by calling Tripp on the phone. However, as stated, Tripp recanted his statement that Mootye was at home at the time of the murders and testified

16

at trial that Mootye confessed to killing Angelica and Alesia. Tripp testified that although he did not see Mootye leave the apartment on the night before or the morning of the murders, Tripp and Pittman picked up Mootye from an apartment complex after the murders. Trial testimony from Pittman, Tripp, and Lindsey placed Mootye in a close proximity to the Twillies' home around the time of the murders. Detective McLemore also testified at trial that the apartment complex where Pittman and Tripp picked up Mootye was "less than a mile-and-a-half" walk from the Twillies' home. Tripp also testified that Mootye called him and asked Tripp to move a gun from Mootye's nightstand and put it in the trunk of Pittman's car.

¶33. Upon review, we find that Detective McLemore's testimony that Mootye told him he was at home during the time of the murders does not present evidence that, if found credible by the jury, would raise a reasonable doubt as to Mootye's guilt. *See Sims*, 213 So. 3d at 101 (¶43). The record shows that Mootye failed to "offer evidence as to the physical distance from his alleged location to the place where the crime was committed from which the jury could reasonably conclude that it was impossible for him to have committed the crime." *Sims*, 213 So. 3d at 101 (¶45) (internal quotation mark omitted). As stated, a defendant is entitled to a jury instruction supporting his alibi defense theory only where the "defendant asserts the defense of alibi[] and presents testimony in support of that defense . . . ." *Roper*, 981 So. 2d at 1023 (¶12); *Morris*, 777 So. 2d at 29 (¶63). The record contains no evidentiary basis for Mootye's alibi, and his defense is simply a denial of guilt that does not warrant an

17

alibi instruction.[13]  *See Sims*, 213 So. 3d at 101 (¶46); *Morris*, 777 So. 2d at 29 (¶65).

Accordingly, we find no abuse of discretion in the trial court's denial of Mootye's jury

instruction.[14]

## II.    *Batson* Challenge

¶34.    Mootye next argues that the trial court failed to conduct a proper *Batson* analysis in

overruling Mootye's *Batson* objection.  Mootye claims that the trial court determined only

that the State offered a facially valid race-neutral reason for each peremptory strike and failed

to then consider whether the State's facially-valid race-neutral reasons were a pretext for

purposeful discrimination.  Mootye argues that the State's challenges lacked support in the

record, which he asserts is an indicator of pretext.  Mootye maintains that by failing to

---

[13] Judge Westbrooks's dissent fails to acknowledge that Tripp's pretrial inconsistent statement, which Tripp recanted, is not substantive evidence to support an alibi defense instruction.  As stated above, the evidence in the record before the trial judge failed to present any evidentiary basis for an alibi instruction.  Tripp testified at trial that Mootye was not home on the morning of the murders; Tripp picked up Mootye after the murders at an apartment complex near the scene of the crime; and Mootye confessed to him that he murdered Angelica and Alesia.  Judge Westbrooks's dissent is faulty in the assertion that Tripp's pretrial statement to police officers, which he later recanted, constitutes substantive evidence.  It does not, as reflected by an application of the law to the facts in the record of trial of this case.  *See DeHenre*, 43 So. 3d at 419 (¶57) ("Prior inconsistent, out-of-court statements made by a nonparty witness are not admissible as substantive evidence.").

Additionally, contrary to the assertion of Judge Westbrooks in her dissent, the majority does not rest upon loose parallels of the facts in the present case to the facts of precedent.  The majority follows the law in applying precedent to the particular facts of this case.

[14] *See also Sanford v. State*, 372 So. 2d 276, 279-80 (Miss. 1979) (finding no abuse of discretion in the trial court's denial of the defendant's alibi instruction where the instruction contained "erroneous language" that was not supported by testimony and where "the instruction seems to focus and comment upon only the alibi testimony in isolation from the rest of the evidence . . .").

18

consider whether the State's race-neutral reasons were given as a pretext for discriminatory intent, the trial court failed to sufficiently ensure that the State's peremptory strikes of Jurors 4, 9, and 17 was credible and non-pretextual.

¶35. "Peremptory strikes may not be used for the purpose of striking jurors based solely on their race or gender." *Lewis v. State*, 239 So. 3d 1097, 1099 (¶6) (Miss. Ct. App. 2018). We review a trial court's ruling on a *Batson* challenge "with great deference because finding the striking party engaged in discrimination is largely a factual finding." *Id*. (internal quotation marks omitted). "The trial judge acts as finder of fact when a *Batson* issue arises." *Allen v. State*, 235 So. 3d 168, 171 (¶7) (Miss. Ct. App. 2017). "We will not overrule a trial court on a *Batson* ruling unless the record indicates that the ruling was clearly erroneous or against the overwhelming weight of the evidence." *Id*.

¶36. For the purposes of "safeguard[ing] against racial discrimination in jury selection," the United States Supreme Court set forth the following three-step process:

> First, the party objecting to the use of a peremptory strike has the burden to make a prima facie case that race was the criterion for the strike. Second, if the objecting party makes such a showing, the burden shifts to the striking party to state a race-neutral reason for the strike. Third, after the striking party offers its race-neutral explanation, the court must determine if the objecting party met its burden to prove purposeful discrimination in the exercise of the peremptory strike—that the stated reason for the strike was merely a pretext for discrimination.

*H.A.S. Elec. Contractors Inc. v. Hemphill Const. Co.*, 232 So. 3d 117, 123 (¶14) (Miss. 2016) (citing *Batson*, 476 U.S. at 89). Mootye, as the opponent of the strike, bears the burden "to show that the race-neutral explanation given is merely a pretext for racial discrimination." *Pruitt v. State*, 986 So. 2d 940, 943 (¶8) (Miss. 2008).

¶37. Here, Mootye argues that the trial court's *Batson* inquiry ended with a finding that the State had offered facially valid race-neutral reasons; the trial court did not undertake its duty to perform *Batson*'s third step and determine whether the facially valid reasons were offered as pretext for purposeful discrimination. The United States Supreme Court has expressed that not until the third step that the persuasiveness of the justification does not become relevant until the third step—"the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (citing *Batson*, 476 U.S. at 98). Mootye asserts that as in *Hardison*, the trial court's failure to undertake *Batson*'s third step amounts to clear and reversible error, thus entitling him to a new trial. *See Hardison v. State*, 94 So. 3d 1092, 1100-02 (¶¶20-31) (Miss. 2012).[15]

¶38. The record reflects that Mootye made *Batson* challenges regarding the State's striking the following jurors: Juror 4, Juror 9, and Juror 17. Although the trial court did not

---

[15] In *Hardison*, 94 So. 3d at 1097 (¶14), the State made a *Batson* challenge to the defendant's peremptory strikes. On appeal, Hardison, the defendant, argued that the trial court erred by not requiring the State to make a prima facie showing of racial discrimination and by sustaining the State's *Batson* challenge. *Id*. After the State made its *Batson* challenge, Hardison argued that he struck one of the jurors because the juror's responses in voir dire indicated that he might be pro-prosecution. *Id*. at 1099 (¶23). The trial court ruled that Hardison failed to present a sufficient race-neutral reason for striking the juror. *Id.* at 1098 (¶20). The supreme court stated that "[i]n finding the reason was not race-neutral, the trial [court] did not proceed to the third part of the *Batson* analysis—pretext." *Id*. at 1099 (¶24). The supreme court then explained that because "Hardison provided the trial court with a race-neutral reason," the trial court was required "to proceed to the third step of the *Batson* analysis." *Id*. at 1100 (¶26). The supreme court ultimately held that the trial court's failure to proceed to the third step of the *Batson* analysis "constituted clear error." *Id*. Unlike *Hardison*, we find that the trial court in the present case did complete the third step of the *Batson* analysis.

explicitly state a finding of a prima facie case, the trial court asked for a response from the State. The State then offered race-neutral reasons. With respect to Juror 4, the State explained that "there was concern from our law enforcement officers that there may be some connection to [Juror 4]" and Jamie Hooker, a former law enforcement officer that was recently arrested. As to Juror 9, the State argued that when the State asked about having a close personal friend or family member that had been recently arrested for a felony, Juror 9 raised her hand and was very flippant when asked about whether or not she could set that aside. The State explained that Juror 9 leaned back in her seat and leaned toward the wall, appearing to dismiss the question. The State then argued that Juror 17 "had some very recent employment history" and "was nonresponsive" about two different questions, as well as some of the law enforcement questions. The State asserted that Juror 17 also raised his hand as to having a person close to him that had previously been arrested for a felony. Defense counsel responded that she did not recall seeing the body language and responses of Jurors 9 and 17. The trial court ultimately overruled Mootye's *Batson* challenges after finding that "having close friends or relatives being previously charged with felonies" was a race-neutral reason.

¶39.    Although the trial court did not make specific findings with regard to the third step of the *Batson* analysis, the Mississippi Supreme Court has held that *Batson* "did not articulate a particular means of accomplishing the third step." *Pruitt*, 986 So. 2d at 946 (¶20). The *Pruitt* court quoted a Second Circuit case rejecting a requirement that the trial court must make specific findings of fact regarding the race-neutral reasons: "As long as a trial judge affords the parties a reasonable opportunity to make their respective records, he may express

21

his *Batson* ruling on the credibility of a proffered race-neutral explanation in the form of a clear rejection or acceptance of a *Batson* challenge." *Id*. at (¶20) (quoting *Messiah v. Duncan*, 435 F.3d 186, 198 (2nd Cir. 2006)). As stated, Mootye has the burden "to show that the race-neutral explanation given is merely a pretext for racial discrimination. *Id*. at 943 (¶8). Here, the record reflects that the trial court found the State's race-neutral reasons credible based on the trial court's rejection of Mootye's *Batson* challenge—thus accomplishing the third step of the *Batson* analysis. *Id*. at 946 (¶20). Because the trial court's denial of Mootye's *Batson* challenge was not clearly erroneous or against the overwhelming weight of the evidence, we affirm the trial court's ruling on this issue. *See Allen*, 235 So. 3d at 171 (¶7).

### III. Ineffective Assistance of Counsel

¶40. In his supplemental pro se brief, Mootye argues that his trial counsel was ineffective in two ways: (1) for failing to assert that the trial court committed reversible error by not instructing the jury on the venue element alleged in the indictment and (2) for failing to object to the State's expert witnesses who were "damaging" to Mootye's defense. As to his expert witness claim, the crux of Mootye's argument is that his trial counsel did not object when the trial court failed to perform the gatekeeping obligation set forth in *Daubert v. Merrell Dow Pharmaceuticals Inc*., 509 U.S. 579 (1993), as to these witnesses.

¶41. We have held that "[o]n direct appeal, a claim for ineffective assistance of counsel should only be addressed when (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the

22

appellate court to make the finding without consideration of the findings of fact of the trial judge." *Morton v. State*, 246 So. 3d 895, 905 (¶26) (Miss. Ct. App. 2017). Here, the State maintains that the record is inadequate for this Court to make a finding on direct appeal regarding Mootye's claim that his trial counsel was deficient for failing to object to the State's expert witnesses. Where "the parties have made no stipulation as to the adequacy of the record, we must inquire whether the record affirmatively shows that [Mootye] was denied effective assistance of counsel." *Johnson v. State*, 196 So. 3d 973, 975 (¶8) (Miss. Ct. App. 2015). On direct appeal, we will deny relief in those matters "where the record cannot support an ineffective assistance of counsel claim . . . [and we will] preserv[e] the defendant's right to argue the same issue through a petition for post-conviction relief." *Id*. (quoting *McClendon v. State*, 152 So. 3d 1189, 1192 (¶12) (Miss. Ct. App. 2014)).

¶42. However, the State makes no such stipulation as to Mootye's venue argument, and the State's brief addresses the merits of this argument. Therefore, in the case before us, we find that only one of Mootye's claims is confined to the record and can be found within the trial transcript. Accordingly, we will consider only Mootye's ineffective-assistance-of-counsel claim as to venue. We decline to address his ineffective-assistance-of-counsel claim as to trial counsel's failure to object to the State's expert witnesses because "[w]e cannot say that the trial record, standing alone, validates [Mootye's] . . . claim." *Morton*, 246 So. 3d at 905 (¶28). We therefore preserve Mootye's right to argue this issue in a motion for postconviction relief.

¶43. "In order to prevail on a claim of ineffective assistance of counsel, a defendant must

23

show (1) that his defense counsel's performance was deficient, and (2) that the deficient performance was prejudicial to his defense." *Johnson*, 196 So. 3d at 975 (¶8) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). We determine whether a trial court's performance was both deficient and prejudicial by examining the totality of the circumstances." *Id*. Upon review of an ineffective-assistance-of-counsel claim, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. (quoting *Herrington v. State*, 102 So. 3d 1241, 1244-45 (¶11) (Miss. Ct. App. 2012)). The supreme court has clarified that "[t]rial counsel's decisions on whether or not to file certain motions, call witnesses, ask certain questions, or make certain objections fall within the ambit of trial strategy and cannot give rise to an ineffective assistance of counsel claim." *Id*. (quoting *Carr v. State*, 873 So. 2d 991, 1003 (¶27) (Miss. 2004)).

¶44. Mootye argues that his trial counsel was deficient by not objecting to the trial court's failure to ensure that the jury was instructed that "before finding [Mootye] guilty, [the jury] must determine that the State proved beyond a reasonable doubt the issue of venue, that is. that the crime occurred in Forrest County, Mississippi."

¶45. Upon reviewing the record, we find that jury was instructed on all three counts that in order to find Mootye guilty of murder, they must find that he killed the victims in Forrest County, Mississippi. The record shows that Jury Instructions S-1A, S-2A, and S-3A were all given and included the language regarding Forrest County. Mootye's argument therefore

lacks merit.

¶46.   For the foregoing reasons, we find that Mootye's arguments lack merit, and we therefore affirm the trial court's judgment on all of Morton's convictions and sentences.

¶47.   **AFFIRMED.**

**J. WILSON, P.J., GREENLEE, TINDELL, LAWRENCE AND C. WILSON, JJ., CONCUR.  BARNES, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD AND McCARTY, JJ.; WESTBROOKS, J., JOINS IN PART.  WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD AND McCARTY, JJ.**

**BARNES, C.J., DISSENTING:**

¶48.   Because there was testimony to support the giving of the defense's proposed alibi instruction (Jury Instruction D-5), I find that the circuit court's refusal of the instruction constitutes reversible error.

¶49.   As the majority notes, the circuit court did not base its refusal of the alibi instruction on the issue of notice.  Rather, the court concluded that the evidence was insufficient to support the giving of the proposed instruction:  "I'm not addressing whether you gave the notice, but I do think it takes something affirmative to show.  You can't base it on a detective's testimony to say, well that's his alibi and have an alibi instruction submitted." While a court's denial of a jury instruction is reviewed for abuse of discretion, *Burleson v. State*, 166 So. 3d 499, 509 (¶28) (Miss. 2015) (citing *McInnis v. State*, 61 So. 3d 872, 876 (¶10) (Miss. 2011)), I find that, in this case, the circuit court did err.  "[W]hen there is evidence before the jury that would support a defense of alibi, it is reversible error not to instruct the jury as to how the law compels the jury to consider such evidence." *Owens v.*

25

*State*, 809 So. 2d 744, 746 (¶6) (Miss. Ct. App. 2002) (citing *Young v. State*, 451 So. 2d 208, 210 (Miss. 1984)). As the majority acknowledges, Detective McLemore testified unequivocally that he verified Mootye's alibi:

> A. *I verified his – what* [*Mootye's*] *alibi was*. . . He told me that the night before that him, himself, Deveiun Tripp, and Mario, which is Deveiun's nephew, were at the apartment at 200 Foxgate. They w[ere] there all night. . . . [Mootye] said he watched [a ball game] till around 7 or 8, and he remembers going to bed about 11 or 11:30. At that time[,] he said the next morning he woke up and went straight to work.
>
> Q. Did he indicate if he had ever left his house during the night of February 21 from 11 p.m. until he went to work?
>
> A. No, ma'am.
>
> . . . .
>
> Q. What, if anything, else did you learn from Mr. Mootye during that interview?
>
> A. Basically who could verify his alibi. He advised me that Deveiun Tripp could verify that he was there all night, that he did not leave the house, and he woke up the next morning.
>
> . . . .
>
> Q. Were you able to verify the alibi that you were given by Mr. Mootye?
>
> A. Yes, ma'am. It was – *I did verify that alibi*.[16]

---

[16] At trial, Tripp confirmed that he initially told police that Mootye was home all evening and even admitted on direct examination that he never saw Mootye actually leave the house. Tripp also confessed that he told two other persons that Mootye had been home all evening. But on the Friday following the murders—when facing arrest for accessory after the fact—Tripp changed his story, telling police that he picked up Mootye that Monday morning and that Mootye had confessed to the murders. Tripp explained to the court that he "lied at first, but I'm telling the truth now." While evidence of Tripp's prior inconsistent statements may not be considered as evidence supporting Mootye's alibi defense, *see Bailey v. State*, 952 So. 2d 225, 236 (¶27) (Miss. Ct. App. 2006), Detective McLemore's testimony

(Emphasis added). I disagree with the State's argument that Detective McLemore's testimony is not sufficient to establish Mootye's alibi that he was home when the murders occurred. The detective's testimony was not simply that Mootye claimed he was home all night; the detective also stated that he had "verif[ied] that alibi." I find Detective McLemore's testimony constituted sufficient evidence to support the giving of the alibi instruction by the circuit court.

¶50. To assert an alibi defense, the defendant must "present evidence that, *if found credible by the jury*, would raise a reasonable doubt as to his culpability based on notions of the physical impossibility of having been at the crime scene during the crime's commission." *Owens*, 809 So. 2d at 747 (¶8) (emphasis added). The Mississippi Supreme Court has held

> [E]very accused has a fundamental right to have her theory of the case presented to a jury, even if the evidence is minimal. We have held that "it is, of course, an absolute right of an accused to have every lawful defense he asserts, even though based upon meager evidence and highly unlikely, to be submitted as a factual issue to be determined by the jury under proper instruction of the court. This Court will never permit an accused to be denied this fundamental right." *O'Bryant v. State*, 530 So. 2d 129, 133 (Miss. 1988).

*Chinn v. State*, 958 So. 2d 1223, 1225 (¶13) (Miss. 2007). Finding that the circuit judge's decision to refuse Jury Instruction D-5 was reversible error, I would reverse and remand for a new trial before a properly instructed jury.

**McDONALD AND McCARTY, JJ., JOIN THIS OPINION. WESTBROOKS, J., JOINS THIS OPINION IN PART.**

**WESTBROOKS, J., DISSENTING:**

¶51. I agree with the dissenting opinion, but I write separately because I too disagree with

can.

27

the majority's opinion.[17]   The majority finds Mootye presented insufficient evidence to support an alibi jury instruction.[18]   Loose parallels of the current facts with those of the defendants in *Sims*,[19] *Morris*,[20] and *Moore*,[21] overlook Mootye's *verified* alibi.   The trial court erred in denying Mootye's proposed alibi instruction (Jury Instruction D-5); the denial constitutes reversible error.

¶52.    Oxford defines the term verify as, "[to] make sure or demonstrate that something is *true*, accurate, or justified." *Verify*, The Concise Oxford American Dictionary (11th ed. 2006).   The majority characterizes Detective McLemore's testimony as a "simple denial of guilt," asserting Mootye merely *told* the detective about his whereabouts, absent any demonstration of truth. *Owens*, 809 So. 2d at 747 (¶8).   I respectfully disagree.

¶53.    Yes, Detective McLemore's testimony established Mootye *told* him about his alibi.[22]

---

[17] I do not write separately only because I disagree; I also write separately because dissents are tools for betterment. *See* Interview with Ruth Bader Ginsburg, Justice, United States Supreme Court, in New York, N.Y. (May 2, 2002) ("Dissents speak to a future age. It's not simply to say, 'My colleagues are wrong and I would do it this way.' But the greatest dissents do become court opinions and gradually over time their views become the dominant view.  So that's the dissenter's hope: that they are writing not for today but for tomorrow.").

[18] Though divergent from that of the majority, I disagree with the characterization of my opinion as "faulty."  Emphasizing the importance of judicial civility, I would assert that the differing positions simply reflect a diverse pool of perspective and assure no tenable view of the law is lost on this Court.

[19] *Sims v. State*, 13 So. 3d 90 (Miss. Ct. App. 2016).

[20] *Morris v. State*, 777 So. 2d 16 (Miss. 2000).

[21] *Moore v. State*, 822 So. 2d 1100 (Miss. Ct. App. 2002).

[22] Mootye's alibi, as *told* to Detective McLemore, was that he was at home the entire night of the murder.  Mootye named Deveium Tripp and Mario, Deveiun's nephew as persons at the 200 Foxgate Avenue (Unit 9E) apartment with him.

28

The testimony did not end there. The majority discounts the portion of Detective McLemore's testimony indicating that he heard about, and subsequently *verified* Mootye's alibi through his own investigation of third party witness, Deveium Tripp. Tripp initially told detectives that Mootye was in the apartment, located at 200 Foxgate Avenue, all night on the date of the murder. Through Tripp, Detective McLemore was able to corroborate Mootye's alibi. Later, facing arrest, Tripp offered a conflicting story, implicating Mootye in the murders.

¶54. Despite Tripp's inconsistent testimony, the uncorroborated assertions of the defendant and lay witnesses in *Sims v. State*, 213 So. 3d 90 (Miss. Ct. App. 2016), pale in comparison. Both purported alibis in *Sims*, even if true, failed to "render it impossible for him [the defendant] to be the guilty party," based on the investigative time line. *Id.* at 101 (¶¶44-45) (quoting *Owens*, 809 So. 2d at 746 (¶7); Black's Law Dictionary 71 (7th ed. 1999)). Further, the defendant in *Sims* offered no proof of investigation or verification of either alibi. *Id.* at 101 (¶46). In fact, the defense failed to submit alibi jury instructions for consideration. *Id.* at 102 (¶46).

¶55. Also, *Moore v. State*, 822 So. 2d 1100 (Miss. Ct. App. 2002), lacks a basis for comparison. Differentiable from Mootye's circumstances, the investigator in *Moore* testified the defendant *told* authorities that on the night of the victims' disappearances, the defendant spoke with one of the victims via phone. *Moore*, 822 So. 2d at 1100 (¶36). The defendant asserted that his phone call with the victim proved he was in a different location at the time of the deaths. *Id.* Because investigators did not establish a time for the murder, neither the

29

testimony nor the purported phone call could possibly establish or *verify* an alibi for the defendant. *Id.*

¶56. Likewise, the *Morris* defendant's alibi collapsed during police attempts to substantiate his whereabouts at the time of the crime. *Morris*, 777 So. 2d at 29 (¶65). No corroborating witness or detective testified or made prior claims *verifying* the defendant's alibi. *Id.* Here, Mootye's alibi places him at a single location, 200 Foxgate Avenue, the entire night. The investigative time line does not allow for the possibility that Mootye was both present at his home (as *verified* by the detective) and at the scene of the murder (as the fleeing suspect).

¶57. The trial court's decision, echoed by the majority, reaches beyond the court's intended scope. It is well established "[t]he jury . . . is the sole judge of the weight and credibility of the witnesses testifying, including . . . alibi witnesses . . . ." *Moore v. State* 374 So. 2d 821 (1979). "[W]hen the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony." *Holmes v. State*, 481 So. 2d 319, 321 (Miss. 1985) (quoting *Gathright*, 380 So. 2d at 1278). In two pre-trial statements to police, Tripp corroborated Mootye's alibi; his statements were initially deemed sufficient to verify Mootye's alibi by Detective McLemore. Though Tripp abandoned his prior statements for a starkly different series of events at trial, the jury should have been allowed the opportunity to employ its discernment in determining witness credibility. Maybe Tripp "lie[d] at first." Perhaps his later statement and trial testimony were a distortion of the truth. There is no definitive way of making either determination, and it is "the role of the jury" to determine witness credibility. *Ransom v. State*, 919 So. 2d 887, 893 (¶30) (Miss. 2005)

(Dickinson, J., dissenting). "In determining a witness' credibility, jurors are allowed latitude in deriving facts from each witness's assertions, and jurors must determine the value of the conflicting testimony introduced during the trial." *Flowers v. State*, 144 So. 3d 188, 196 (¶26) (Miss. Ct. App. 2014); *see also Burrell v. State*, 613 So. 2d 1186, 1192 (Miss. 1993); *Winters v. State*, 449 So. 2d 766, 771 (Miss. 1984); *Blackwell v. State*, 744 So. 2d 359, 364 (¶18) (Miss. Ct. App. 1999). Detective McLemore's sworn testimony provides the truth, as revealed and *verified* by his investigation. The inconsistent testimony of Tripp is inconsequential and should be balanced with that of Detective McLemore, but not by the Court. In *Tubbs v. State*, 402 So. 2d 830, 834-35 (Miss. 1981), the Court held "an alibi defense presents a question of fact to be resolved by the jury." Although a jury is "under [no] duty to accept an alibi defense . . . [the jury] must consider all of the testimony in determining the guilt of innocence of an accused." *Id.* The veracity of the alibi, and testifying witnesses should have been left to the jury's discernment. Mootye was entitled to the jury instruction.

¶58. For the foregoing reasons, I respectfully dissent from the majority's decision to affirm the trial court's denial of Mootye's Jury Instruction D-5, and I would reverse and remand for a new trial.

**McDONALD AND McCARTY, JJ., JOIN THIS OPINION.**

31